Filed 2/18/15

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| ADRIANA GIANTURCO SALTONSTALL et al., | |
| Plaintiffs and Appellants, | C077772 |
| v. | (Super. Ct. No. 34201480001840CUWMGDS) |
| CITY OF SACRAMENTO, | |
| Defendant and Respondent; | |
| SACRAMENTO BASKETBALL HOLDINGS, LLC, | |
| Real Party in Interest and Respondent. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Timothy M. Frawley, Judge. Affirmed.

The Smith Firm and Kelly T. Smith for Plaintiffs and Appellants.

MEYERS, NAVE, RIBACK, SILVER & WILSON, Amrit S. Kulkarni, Julia L. Bond and Shaye Diveley for Defendant and Respondent.

1

PIONEER LAW GROUP, Andrea A. Matarazzo, Jeffrey K. Dorso and Jay M. Harris for Real Party in Interest and Respondent.

This appeal involves a challenge under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21050 et seq.) to certification of an environmental impact report (EIR) and approval of a project to build a new entertainment and sports center (ESC) in downtown Sacramento.[1] The project represents a partnership between the City of Sacramento (City) and Sacramento Basketball Holdings LLC (Sacramento Basketball Holdings) to build a downtown arena at which the Sacramento Kings, a professional basketball team, will play. Planning, approval, and construction of the arena has proceeded apace because the National Basketball Association (NBA) has expressly reserved the right to acquire the Sacramento Kings and relocate the team to another city if a new arena in Sacramento does not open by 2017. To facilitate the timely opening of a new downtown arena, the Legislature modified several deadlines under CEQA by adding section 21168.6.6 to the Public Resources Code. Section 21168.6.6 also allows the City to exercise limited eminent domain powers to acquire property for the project before completion of its environmental review. Section 21168.6.6, however, does not substantively alter other CEQA requirements for environmental review of the project.

---

[1] Undesignated statutory references are to the Public Resources Code. References to Guidelines are to those located in California Code of Regulations, title 14, section 15000 and following. These Guidelines are promulgated by the secretary of the California Resources Agency to implement CEQA requirements. (§ 21083, subd. (e); *Center for Sierra Nevada Conservation v. County of El Dorado* (2012) 202 Cal.App.4th 1156, 1161, fn. 1.)

In a prior appeal, Adriana Saltonstall and 11 other petitioners argued section 21168.6.6 violates the constitutional separation of powers doctrine because the Legislature restricted the grounds on which the courts may issue a preliminary injunction to stay the downtown arena project.[2] (*Saltonstall v. City of Sacramento* (2014) 231 Cal.App.4th 837 (*Saltonstall I*).) Saltonstall also argued the trial court erred by refusing to grant a preliminary injunction despite harm to the public and the environment due to demolition of part of the Downtown Plaza shopping mall and construction of the downtown arena in its place. (*Id.* at p. 857.) We concluded section 21168.6.6 does not violate separation of powers and the trial court properly denied Saltonstall's request for a preliminary injunction. (*Id.* at p. 858.)

In this appeal, Saltonstall contends (1) the City violated CEQA by committing itself to the downtown arena project before completing the EIR process, (2) the City's EIR failed to consider remodeling the current Sleep Train Arena as a feasible alternative to building a new downtown arena, (3) the EIR did not properly study the effects of the project on interstate traffic traveling on the nearby section of Interstate Highway 5 (I-5), (4) the City did not account for large outdoor crowds expected to congregate outside the downtown arena during events, (5) the trial court erred in denying her Public Records Act request to the City to produce 62,000 e-mail communications with the NBA; and (6) the trial court erred in denying her motion to augment the administrative record with an e-mail between Assistant City Manager John Dangberg and a principal of Sacramento Basketball Holdings, Mark Friedman (the Dangberg-Friedman e-mail) and a 24-page

---

[2] The other 11 petitioners are William Reany, Jeanie Keltner, Delphine Cathcart, Bob Blymyer, Helen Maggie O'Mara, J. Bolton Phillips, Kevin Coyle, Karen Redman, Ronald H. Emslie, Christine Hansen, and Sarah E. Foster. We refer to petitioners collectively as Saltonstall.

3

report regarding forgiveness of a $7.5 million loan by the City to the Crocker Art Museum.

We conclude the City did not prematurely commit itself to approving the downtown arena project before completing its environmental review. Under CEQA, the City was allowed to engage in land acquisition for its preferred site before finishing its EIR. Moreover, section 21168.6.6 expressly allowed the City to exercise its eminent domain power to acquire the 600 block of K Street as the site of the arena before finishing its environmental review. The preliminary nonbinding term sheet between the City and Sacramento Basketball Holdings constituted an agreement to negotiate regarding the project and did not foreclose environmental review, mitigation, or even rejection of the project.

As to consideration of feasible alternatives, the City did not err by declining to study the option of remodeling the Sleep Train Arena. The City studied a "no project" alternative involving continued use of the Sleep Train Arena and an alternative that involved building a new arena next to the current arena in Natomas. Both the no project and new Natomas arena alternatives failed to meet most of the City's objectives for the project to revitalize its downtown area. Regardless of whether the Sleep Train Arena remodel alternative might have been environmentally superior to the project approved, the remodel alternative would have suffered the same problems of location that caused the City to reject the other Natomas-based alternatives.

We reject Saltonstall's argument that the EIR is defective for failure to study mainline interstate traffic on I-5 even though the City studied the timing and extent of traffic congestion on the freeway that will likely result due to the project. The City was not required to separately consider the effect of the project on motorists subject to the same traffic conditions simply because their trip origins and destinations might have been

4

different than those of local commuters. The EIR and Sacramento City Council's statement of overriding considerations demonstrate that the decision-makers were informed of and understood the adverse consequences on I-5 traffic resulting from the downtown arena project. The EIR's traffic study of the project's effects on I-5 traffic was not deficient.

Saltonstall's contention regarding failure to study post-event crowd safety and potential for violence does not implicate CEQA. Saltonstall's argument focuses on a social issue for which no environmental effect is described. Mere speculation about possible crowd violence and its possible effect on the environment does not compel EIR review.

Saltonstall may not raise the issue of the 62,000 e-mail communications she requested from the City under the California Public Records Act (Public Records Act) (Gov. Code, § 6250 et seq.). Review of trial court orders on Public Records Act motions may be made only by writ petition, not by direct appeal. As to the Dangberg-Friedman e-mail and loan forgiveness report, we deem Saltonstall's argument forfeited for lack of any analysis of how these documents might meet the definition of documents to be included in the administrative record under the Public Resources Code.

Accordingly, we affirm (1) the judgment dismissing Saltonstall's challenge to the sufficiency of the City's EIR and approval of the downtown arena project, and (2) the trial court's order denying her motion to augment the administrative record.

BACKGROUND

*The Downtown Arena Project*

Since 1988, the Sacramento Kings have been playing at the Sleep Train Arena (formerly named the Arco Arena). At the time of its opening, the Sleep Train Arena was the smallest arena in the NBA by square footage and the second smallest in terms of

seating capacity. Studies and proposals to replace the Sleep Train Arena with another location in Sacramento have been ongoing since the late 1990s.

In 2012, the City developed a preliminary term sheet with the previous owners of the Sacramento Kings to build a multi-purpose facility near downtown Sacramento in a section called the "Railyards." The parties were unable to reach an agreement, and the previous team owners broke off discussions with the City.

In January 2013, the previous owners entered into an agreement to sell the Sacramento Kings to an investor group in Seattle, Washington. The NBA announced it would address the issue of the Sacramento Kings' proposed sale and relocation at a meeting scheduled for April 2013. When news of the proposed sale became public, the City worked with members of the public to find a new, local investor group to acquire the team and ensure the team would remain in Sacramento. In February 2013, the city council authorized the city manager to engage in negotiations with prospective investor groups to prepare preliminary terms for city council consideration of a plan to keep the team in Sacramento.

On March 1, 2013, an investor group that became Sacramento Basketball Holdings presented a plan to the NBA to acquire the Sacramento Kings, construct a new downtown arena in partnership with the City, and keep the team in Sacramento on a long-term basis. On March 26, 2013, the city council approved a preliminary nonbinding term sheet for development of a new entertainment and sports center in downtown Sacramento at the site of the Downtown Plaza, a shopping mall with declining occupancy rates. The preliminary nonbinding term sheet listed issues for resolution that included the preferred location, financing, ownership, design, construction, operation, and occupancy for a new downtown arena.

The term sheet also included a disclaimer that the City had no obligation to build, finance, or approve the project until it completed its environmental review and secured all necessary permits for the project. The preliminary nonbinding term sheet further stated the City retained sole discretion to weigh the environmental consequences and to reject the project entirely.

In May 2013, the board of governors for the NBA approved the sale of the Sacramento Kings to Sacramento Basketball Holdings. However, the NBA's board of governors reserved the right to acquire the Sacramento Kings and relocate the team to another city if a new arena in Sacramento does not open by 2017.

### Downtown Arena Design

The downtown arena project involves demolition of a portion of the Downtown Plaza, located at the 600 block of K Street in Sacramento and bounded by J Street to the north, L Street to the south, 7th Street to the east, and 4th Street to the west. In place of that portion of the Downtown Plaza, the City and Sacramento Basketball Holdings plan to construct a 17,500-seat entertainment and sports center along with approximately 1.5 million square feet of related retail, commercial, office, and residential development. The project will include as many as 250 new hotel rooms and 550 residential units. Also as part of the project, the City will transfer ownership of six off-site municipally owned digital billboards along with certain other City-owned properties to Sacramento Basketball Holdings.

The downtown arena has been designed to meet the requirements of the U.S. Green Building Council's Leadership in Energy and Environmental Design (LEED) Gold certification. Among the downtown arena's environmental design goals are: carbon neutrality, reduction of per-attendee-vehicle miles travelled, and reduced greenhouse gas

7

emissions. Urban design goals include plans to spark redevelopment of the downtown area with an influx of basketball game and concert event attendees to the arena.

The demolition and construction schedule targets the opening date for the downtown arena for October 2016 to meet the NBA's deadline for keeping the basketball team in Sacramento.

***Section 21168.6.6***

On September 27, 2013, Governor Brown signed Senate Bill 743, which among other things, added section 21168.6.6 to the Public Resources Code. (Stats. 2013, ch. 386, § 7.) Section 16 of Senate Bill 743 "declares that a special law is necessary and that a general law cannot be made applicable within the meaning of Section 16 of Article IV of the California Constitution because of the unique need for the development of an entertainment and sports center project in the City of Sacramento in an expeditious manner." Section 21168.6.6 modifies several CEQA deadlines specifically for the project to build the downtown arena in Sacramento.

Section 21168.6.6 does not change CEQA's standards for required content of the EIR or approval for the project. Instead, section 21168.6.6 provides an accelerated timeline of events along with provisions intended to facilitate expedited CEQA review such as: preparation of documents in electronic format, making the administrative record readily accessible to the public online, mediation of issues among the parties, and a series of informational workshops to be held by the City.

In addition to imposing accelerated deadlines on the City as the lead agency for the project, subdivision (d) of section 21168.6.6 required the Judicial Council, by July 1, 2014, to adopt a rule to facilitate the completion of judicial review of the downtown arena project's compliance with CEQA within 270 days, if feasible.

### *The City's Review and Approval of the Downtown Arena Project*

Consistent with the deadlines set forth in section 21168.6.6, the City engaged in an expedited environmental review process. The City issued a notice of preparation of the EIR on April 12, 2013. The draft EIR was completed and posted on the City's Web site on December 16, 2013. Two days later, the documents relied upon by the City in preparing the draft EIR were also posted online. The City conducted an informal public workshop regarding the draft EIR on December 18, 2013, and a public hearing on January 23, 2014, before the close of public comments. All documents related to the project prepared by the City or submitted by Sacramento Basketball Holdings after the release of the draft EIR were posted on the City's Web site within three business days of the document's preparation or receipt by the City.

As required by section 21168.6.6, the City engaged in mediation with several interested parties (including Saltonstall's attorney) in February 2014 to address issues regarding the draft EIR. The City completed and posted on its public Web site the final EIR for the project on May 9, 2014. The Sacramento City Council certified the final EIR and approved the project on May 20, 2014. Demolition of the shopping mall began in summer 2014.

### *Saltonstall's Motion for Preliminary Injunction*

The day after the City certified the final EIR and approved the project, Saltonstall filed a petition for writ of mandate in which she alleged the City violated CEQA by certifying the final EIR and that section 21168.6.6 violates the California Constitution. In the petition, Saltonstall requested a preliminary injunction, declaratory relief, and attorney fees.

The City filed its notice of determination on May 27, 2014, and certified the administrative record on June 2, 2014.

9

On June 10, 2014, Saltonstall filed a motion for preliminary injunction to stay demolition of the Downtown Plaza, reiterating her contentions that the City violated CEQA by certifying the final EIR and section 21168.6.6 is unconstitutional because it imposes unrealistically short deadlines on the courts to resolve issues related to construction of the downtown arena. The City and Sacramento Basketball Holdings opposed the motion. The trial court denied the motion for preliminary injunction, and Saltonstall appealed. (*Saltonstall I, supra,* 231 Cal.App.4th 837.)

In *Saltonstall I*, we concluded section 21168.6.6 does not materially impair a core function of the courts in a manner that violates separation of powers under the California Constitution, and Saltonstall had not demonstrated any error in the trial court's denial of her request for a preliminary injunction to stop the project. (231 Cal.App.4th at pp. 852, 855, 856.)

### *The Trial Court's Rejection of CEQA Challenges*

On October 10, 2014, the trial court held a hearing on the merits of Saltonstall's CEQA challenge as well as another CEQA challenge brought in a related action by Sacramento Coalition for Shared Prosperity.[3] On October 17, 2014, the trial court issued a decision denying the CEQA challenges. As pertinent to this appeal, the trial court made the following determinations:

*Premature commitment*. The trial court found the City did not approve the project before concluding its EIR review. The preliminary nonbinding term sheet entered into by the City and Sacramento Basketball Holdings did not create an enforceable contract between the parties. Although the City acquired property at its preferred site for the downtown arena, the property acquisition did not foreclose any mitigation measures or

---

[3] The Sacramento Coalition for Shared Prosperity was neither a party in the appeal of *Saltonstall I* nor in this appeal.

alternatives required by CEQA. As the trial court found, "Prior to completing its environmental review of the Project, the City took steps to acquire possession of the Macy's East and Crocker Museum properties." As to the Crocker Museum property, the trial court noted that "[a]s a technical matter, the Crocker Museum transaction involved the City's forgiveness of a $7.5 million loan to the Crocker Art Museum in exchange for the Museum's relinquishment of any and all claims related to City Parking Lots X and Y." The trial court concluded Saltonstall "failed to show that the City's acquisitions of the Macy's East and Crocker Museum properties precluded consideration of any mitigation measures or alternatives that CEQA otherwise required to be considered."

*Failure to consider remodeling the current Sleep Train Arena.* The trial court rejected Saltonstall's contention that the City violated CEQA by failing to study the alternative of remodeling the current Sleep Train Arena. As the trial court noted, the City studied a no project option in which the current arena would continue to operate as presently configured and an option that involved building a new arena near the existing Sleep Train Arena in Natomas. The trial court recounted that Saltonstall asserted it was "'absurd' for the City to claim the impacts of remodeling the existing arena would be similar to the impacts of building a new arena in the same location." As the trial court summarized, Saltonstall sought "to have the City analyze the impacts of making minor, cosmetic upgrades to the existing arena, which they claim, is 'perfectly fine' and 'continues to function perfectly.' " The trial court rejected the claim because, "from the City's perspective, [Saltonstall's] proposal is not an alternative to the Project, it is a different project and would defeat the City's core project objectives." The trial court also noted it was not "absurd for the City to conclude that the impacts of a major overhaul for the existing arena would be similar to the impacts of building a new arena." The trial court agreed with the City that anything less than a new arena would not satisfy the City's

11

objectives of "developing a 'state-of the art' and 'world class' entertainment and sports center that is 'the country's most technologically innovative and advanced entertainment venue.'" That was because the existing arena is "'an old and outmoded facility.'"

*Failure to properly analyze the project's traffic impact on I-5.* The trial court rejected an argument that the City conducted a faulty traffic analysis by underestimating the number of attendees for the downtown arena. The EIR's traffic analysis was based on the arena's 17,500 maximum capacity. Although 1,000 to 2,000 additional ticketed attendees might be accommodated in standing-room-only spaces, the record demonstrates such super-capacity crowds occur only 0.3 percent of the time among events sampled throughout the country. Thus, the arena's maximum seated capacity served as a reasonable number for studying the traffic impact of the project. The trial court deemed an inadvertently omitted traffic mitigation measure to be part of the City's adopted mitigation measures.

The trial court rejected Saltonstall's contention that the City failed to properly assess the impact of the project on nearby I-5. On this point, the trial court found the administrative record supported the conclusion that "[t]he EIR adequately addresses the Project's freeway impacts. The EIR acknowledges that the Project will cause significant impacts on the freeways and that, although payment of a fair share contribution would assist in mitigating the Project's impacts, payment of the fee does not ensure that the Project's impacts will be fully mitigated. The City, having determined that the Project's freeway impacts are significant and unavoidable, adopted a Statement of Overriding Considerations."

The City's response to EIR comments acknowledged the traffic impact will be significant and unavoidable even with the payment of a fair share of mitigation measures by the project applicant. Nonetheless, the City noted Caltrans's comment on the

12

proposed traffic mitigation measures expressed Caltrans's support for the proposed traffic management plan.

*Failure to properly analyze crowd safety.*  The trial court rejected Saltonstall's argument that the City failed to properly analyze impacts to public safety from post-event crowds.  The trial court concluded that "[s]peculation about potential crowd violence is not an impact that was required to be analyzed or mitigated as part of the EIR.  (See [Guidelines], § 15064(d)(3).)"  Moreover, the trial court found that "[t]he EIR adequately considered the Project's Impacts on public services."

*Saltonstall's motion to augment the administrative record.*  At the same time as ruling on Saltonstall's CEQA challenges, the trial court also denied Saltonstall's motion to augment the administrative record with (1) the Dangberg-Friedman e-mail, (2) a 24-page City staff report regarding the City's forgiveness of a $7.5 million loan to the Crocker Art Museum in exchange for the museum's relinquishment of any rights to City parking lots X and Y, and (3) a May 20, 2014 e-mail from Patrick Soluri -- an attorney who publically commented on the project -- to the city council regarding the downtown arena project.  The trial court granted the unopposed request to augment the administrative record with the Soluri e-mail.  However, the trial court denied augmentation of the record with the Dangberg-Friedman e-mail and loan forgiveness report on grounds they were irrelevant to the issue of the City's compliance with CEQA. The trial court also stated that insofar as Saltonstall's motion included a challenge to the City's refusal to comply with a request for documents under the Public Records Act, the matter was not properly before the court.

Within the five court days provided by section 21168.6.6, subdivision (d), Saltonstall timely filed a notice of appeal from the judgment denying her petition for writ of mandate.

13

DISCUSSION

# I

## *CEQA Overview*

CEQA requires public agencies to ascertain the environmental consequences of a project before giving approval to proceed.  (*Golden Gate Land Holdings LLC v. East Bay Regional Park Dist.* (2013) 215 Cal.App.4th 353, 365 (*Golden Gate Land Holdings*).)  "The foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' "  (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 (*Laurel Heights I*), quoting *Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 259.)  "CEQA requires that an agency determine whether a project may have a significant environmental impact, and thus whether an EIR is required, *before* it approves that project."  (*Laurel Heights I*, at p. 394, quoting *No Oil, Inc. v. City of Los Angeles* (1975) 13 Cal.3d 68, 79.)  "A fundamental purpose of an EIR is to provide decision makers with information they can use in deciding *whether* to approve a proposed project, not to inform them of the environmental effects of projects that they have already approved.  If postapproval environmental review were allowed, EIR's would likely become nothing more than *post hoc* rationalizations to support action already taken."  (*Laurel Heights I*, at p. 394.)

In assessing a public agency's compliance with CEQA, we review the administrative record to determine whether the agency prejudicially abused its discretion. (*Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 918.)  "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial

14

evidence.' " (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 (*Goleta*).)

"Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564), we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.' (*Laurel Heights I*, *supra*, 47 Cal.3d at p. 393.) [¶] In evaluating an EIR for CEQA compliance, then, a reviewing court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts. For example, where an agency failed to require an applicant to provide certain information mandated by CEQA and to include that information in its environmental analysis, [the Supreme Court] held the agency 'failed to proceed in the manner prescribed by CEQA.' (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1236; see also *Santiago County Water Dist. v. County of Orange* [(1981)] 118 Cal.App.3d [818,] 829 [EIR legally inadequate because of lack of water supply and facilities analysis].) In contrast, in a factual dispute over 'whether adverse effects have been mitigated or could be better mitigated' (*Laurel Heights I, supra*, 47 Cal.3d at p. 393), the agency's conclusion would be reviewed only for substantial evidence." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 (*Vineyard*).)

15

## II

### *Whether the City Committed Itself to the Project before CEQA Review*

Saltonstall contends the City committed itself to the downtown arena project before completing its review under CEQA. Specifically, Saltonstall argues "that the EIR was fatally corrupted because the City had already entered into an agreement with the NBA to build the arena."[4] As examples of premature commitment, Saltonstall points to (1) public relations efforts coordinated with Sacramento Basketball Holdings, (2) a term sheet with Sacramento Basketball Holdings, and (3) acquisition of the property for the downtown arena and the rights to nearby parking lots from the Crocker Museum before completion of the EIR process.[5] We conclude the record does not demonstrate premature commitment by the City.

### A.

### *CEQA Disallows Project Approval before Completion of a Required EIR*

When a proposed project will arguably have a significant environmental impact, CEQA requires a public agency to prepare an EIR before giving project approval. (*No Oil, Inc. v. Los Angeles* (1974) 13 Cal.3d 68, 85.) For purposes of CEQA, "approval" by public agency "means the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person." (Guidelines, § 15352, subd. (a); see also generally *Save Tara v. City of West Hollywood*

---

[4]  We note the City does not have any agreement with the NBA to build the downtown arena. Instead, the City has entered into a public-private partnership with Sacramento Basketball Holdings for this project. The NBA was not involved in the environmental review or approval process for the downtown arena project.

[5]  Saltonstall also asserts the premature commitment foreclosed the City's proper study of feasible alternatives to the downtown arena, a contention we address separately in part III.

16

(2008) 45 Cal.4th 116, 129 (*Save Tara*).) The *Save Tara* court observed that "[t]he problem is to determine when an agency's favoring of and assistance to a project ripens into a 'commit[ment].' To be consistent with CEQA's purposes, the line must be drawn neither so early that the burden of environmental review impedes the exploration and formulation of potentially meritorious projects, nor so late that such review loses its power to influence key public decisions about those projects." (*Save Tara*, at pp. 130-131.) Thus, *Save Tara* explains that "CEQA review was not intended to be only an afterthought to project approval, but neither was it intended to place unneeded obstacles in the path of project formulation and development." (*Id.* at p. 137.)

Consistent with *Save Tara*, we apply a two-prong test to ascertain whether a public agency has committed itself to a project before conducting the requisite environmental review. " 'First, the analysis should consider whether, in taking the challenged action, the agency indicated that it would perform environmental review before it makes any further commitment to the project, and if so, whether the agency has nevertheless effectively circumscribed or limited its discretion with respect to that environmental review. Second, the analysis should consider the extent to which the record shows that the agency or its staff have committed significant resources to shaping the project. If, as a practical matter, the agency has foreclosed any meaningful options to going forward with the project, then for purposes of CEQA the agency has "approved" the project.' " (45 Cal.4th at p. 139, quoting Remy et al., Guide to the Cal. Environmental Quality Act (CEQA) (11th ed. 2006), at p. 71.) In short, the *Save Tara* test reflects "the general principle that before conducting CEQA review, agencies must not 'take any action' that significantly furthers a project 'in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project.' " (*Save Tara*, *supra*, at p. 138, quoting Guidelines, § 15004, subd. (b)(2)(B).)

17

The question of whether "the lead agency approved a project with potentially significant environment effects before preparing and considering an EIR for the project 'is predominantly one of improper procedure' (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, supra,* 40 Cal.4th at p. 435) to be decided by the courts independently. The claim goes not to the validity of the agency's factual conclusions but to the required timing of its actions." (*Save Tara*, *supra*, 45 Cal.4th at p. 131.)

## B.

### City Efforts and Land Acquisition Prior to Completion of the EIR Process

The city council approved a preliminary nonbinding term sheet -- dated March 23, 2013 -- with the investment group formed to purchase the Sacramento Kings and build the downtown arena, Sacramento Basketball Holdings. In pertinent part, the term sheet stated: "Although this Term Sheet contains the proposed, non-binding terms of a potential transaction which the City has agreed to process, the parties agree that no obligation to enter into definitive transaction documents, or any transaction, shall exist and no project or definitive transaction documents shall be deemed to be approved, until after (i) the proposed project is reviewed in accordance with the requirements of [CEQA], (ii) any additional conditions or changes to the project based on [CEQA] review have been resolved in a manner acceptable to the City and Investor Group [Sacramento Basketball Holdings] and (iii) all required permits for the project have been obtained by the City in accordance with applicable laws and regulations."

The preliminary nonbinding term sheet further provided: "As required by law, the City retains the sole and independent discretion as the lead agency to, among other things, balance the benefits of the ESC project against any significant environmental impacts prior to taking final action if such significant impacts cannot otherwise be

18

avoided, *and determine not to proceed with the ESC project*.  No legal obligations to approve the project, the permits for the project, or the transaction will exist unless and until the parties have negotiated, executed, and delivered definitive agreements based upon information produced during the CEQA environmental review process and on other public review and hearing processes, subject to all applicable governmental approvals." (Italics added.)

In May 7, 2013, the City adopted a resolution to forgive $7.5 million of a $10 million loan to the Crocker Art Museum in exchange for the museum's relinquishment of any claims related to City parking lots X and Y.

A July 9, 2013 agenda for a meeting between the City and Sacramento Basketball Holdings staff listed as a discussion topic, a need to develop a communication strategy in anticipation of media inquiries about the acquisition of the land for the site of the downtown arena.  The agenda stated that "[i]t would be better to initiate control [of] the story with a message crafted and agreed to by the NBA, [Sacramento Basketball Holdings] and City rather than a mad scramble."

On January 7, 2014, the city council adopted a resolution to acquire by eminent domain the block located at 600 K Street in downtown Sacramento.  Consistent with the preliminary nonbinding term sheet, the City would retain title to the property and lease it to Sacramento Basketball Holdings according to a schedule that provided the rent would start at $6.5 million and increase according to a set formula.

The City certified its final EIR and approved the downtown arena project on May 20, 2014.

19

***The City Did Not Commit to the Project before Completing its Environmental Review***

Although the City took steps toward planning the proposed downtown arena prior to completing its environmental review, we conclude the record does not establish premature commitment to the project in violation of CEQA.

### 1. Public Relations Coordination

The only evidence of public relations coordination cited by Saltonstall concerns an agenda item suggesting a unified response to media inquiries about the announced acquisition of the 600 block of K Street for the downtown arena. This evidence does not demonstrate premature commitment by the City for several reasons. First, the agenda appears to have been prepared by the Icon Venue Group and not the City or its staff. Based on this singular cited document, the extent to which the agenda item reflected any view of the City or its staff is entirely unknown. Second, the agenda description suggested the City had not yet formulated a response -- if any -- to media inquiries about acquisition of the 600 block of K Street. The agenda item notes only that it "*would be better* to initiate control of the story with a message crafted and agreed to by the NBA, [Sacramento Basketball Holdings] and City." (Italics added.) Rather than showing premature commitment, it suggests instead that there was not yet coordination of a message -- at least for the acquisition of the 600 block of K Street. Third, even if the agenda item showed the City's favor of and advocacy for the 600 block of K Street as the site for the project, this would still be insufficient to show impermissibly early commitment to the project. "If having high esteem for a project before preparing an environmental impact statement . . . nullifies the process, few public projects would withstand judicial scrutiny, since it is inevitable that the agency proposing a project will

20

be favorably disposed to it." (*Save Tara, supra*, 45 Cal.4th at pp. 136-137, quoting *City of Vernon, supra*, 63 Cal.App.4th at p. 688.)

In short, Saltonstall's single citation to the administrative record to demonstrate a concerted media campaign for the project does not establish premature commitment by the City.

### 2. *The Preliminary Nonbinding Term Sheet*

Under the first prong of the *Save Tara* test, we consider whether the City indicated it would perform a proper environmental review before making a commitment to the project. (*Save Tara*, *supra*, 45 Cal.4th at p. 138.) On this point, the preliminary nonbinding term sheet declared the City had "no obligation to enter into definitive transaction documents, or any transaction," and that "no project or definitive transaction documents shall be deemed to be approved, until after" the downtown arena project was "reviewed in accordance with the requirements of [CEQA]." Elsewhere, the term sheet expressly provided that "the City retains the sole and independent discretion as the lead agency to . . . balance the benefits of the ESC project against any significant environmental impacts prior to taking final action if such significant impacts cannot otherwise be avoided, and determine not to proceed with the ESC project." Thus, the City retained complete discretion to review the project, mitigate adverse environmental effects, and even to refuse to approve the project.

The term sheet was not a binding contract between the City and Sacramento Basketball Holdings. As the term sheet noted, it set forth "the process and framework by which the parties agree[d] to negotiate definitive documents and potential approvals to be considered by the City regarding the potential location, financing, ownership, design, development, construction, operation, use" and other issues related to the project.

In essence, the preliminary nonbinding term sheet was an agreement to negotiate. All provisions of the term sheet are consistent with an agreement to negotiate. The term sheet noted the location of the arena remained to be determined, the parties could consider locations other than at the site of the Downtown Plaza, the ownership structure for the location remained to be negotiated, and efforts to timely complete the project would be made collaboratively. Based on the express reservation by the City of the right to disapprove of the project based on its environmental review, Sacramento Basketball Holdings would not have had a breach of contract claim if the City had decided to reject the project. The preliminary nonbinding term sheet does not show premature commitment to the project by the City.

### 3. Eminent Domain Action for the 600 Block of K Street

The City's exercise of eminent domain to acquire the 600 block of K Street for the site of the downtown arena prior to completion of environmental review is allowed under CEQA. CEQA provides an exception to the prohibition on commitment to a project before environmental review for purposes of land acquisition. Guidelines section 15004, subdivision (b)(2)(A), provides that a public agency may not "[f]ormally make a decision to proceed with the use of a site for facilities which would require CEQA review, regardless of whether the agency has made any final purchase of the site for these facilities, *except that agencies may designate a preferred site for CEQA review and may enter into land acquisition agreements when the agency has conditioned the agency's future use of the site on CEQA compliance*." (Italics added.)

In addition, section 21168.6.6, subdivision (b)(1), expressly provides that "[t]he city may prosecute an eminent domain action for 545 and 600 K Street, Sacramento, California, and surrounding publicly accessible areas and rights-of-way within 200 feet of 600 K Street, Sacramento, California, through order of possession pursuant to the

22

Eminent Domain Law (Title 7 (commencing with Section 1230.010) of Part 3 of the Code of Civil Procedure) prior to completing the environmental review under this division."[6]  Consequently, the City had specific statutory authorization to acquire the 600

_____

[6]    In explaining the authorization for this eminent domain power for a specific site in downtown Sacramento, the Legislature declared in Senate Bill 743, as relevant here:

"(c) The existing home of the [City]'s [NBA] team, the Sleep Train Arena, is an old and outmoded facility located outside of the [City]'s downtown area and is not serviced by the region's existing heavy and light rail transportation networks. It was constructed 25 years ago and a new, more efficient entertainment and sports center located in downtown Sacramento is needed to meet the city's and region's needs.

"(d) The [City] and the region would greatly benefit from the addition of a multipurpose event center capable of hosting a wide range of events including exhibitions, conventions, sporting events, as well as musical, artistic, and cultural events in downtown Sacramento.

"(e) The proposed entertainment and sports center project is a public-private partnership between the [City] and the applicant that will result in the construction of a new state-of-the-art multipurpose event center, and surrounding infill development in downtown Sacramento as described in the notice of preparation released by the [City] on April 12, 2013.

"(f) The project will generate over 4,000 full-time jobs including employees hired both during construction and operation of the entertainment and sports center project. This employment estimate does not include the substantial job generation that will occur with the surrounding development uses, which will generate additional hospitality, office, restaurant, and retail jobs in Sacramento's downtown area.

"(g) The project also presents an unprecedented opportunity to implement innovative measures that will significantly reduce traffic and air quality impacts and mitigate the greenhouse gas emissions resulting from the project.  The project site is located in downtown Sacramento near heavy and light rail transit facilities, situated to maximize opportunities to encourage nonautomobile modes of travel to the entertainment and sports center project, and is consistent with the policies and regional vision included in the Sustainable Communities Strategy adopted pursuant to Chapter 728 of the Statutes of 2008 by the Sacramento Area Council of Governments in April of 2012.  The project is also located within close proximity to three major infill development areas including

23

block of K Street by eminent domain prior to completing its environmental review without running afoul of CEQA. Saltonstall emphasizes the City did more than agree to acquire the property by actually proceeding with eminent domain. However, section 21168.6.6, subdivision (b)(1), provided authority for the City to prosecute an eminent domain action for the 600 block of K Street rather than mere authority to decide to condemn the property.

Of course, as the California Supreme Court has cautioned, the exception for land acquisition "should not swallow the general rule (reflected in the same regulation) that a development decision having potentially significant environmental effects must be *preceded*, not *followed*, by CEQA review." (*Save Tara*, at pp. 133-134.) Saltonstall does not provide any citation to the record to show that acquisition of the 600 K Street site compelled the City to approve the project or to reject any mitigation measures. Thus, we are not persuaded the City violated CEQA by acquiring the 600 block of K Street by eminent domain.

### 4. *Crocker Art Museum Loan Forgiveness*

Saltonstall asserts the forgiveness of $7.5 million of a City loan to the Crocker Art Museum establishes premature commitment to the downtown arena project. However, Saltonstall does not explain how forgiveness of the loan shows premature commitment to the downtown arena project. Our review of the staff report on loan forgiveness reveals

projects (The Bridge District, Railyards, and Township Nine) that received infill infrastructure grants from the state pursuant to Proposition 1C.

"(h) It is in the interest of the state to expedite judicial review of the entertainment and sports center project, as appropriate, while protecting the environment and the right of the public to review, comment on, and, if necessary, seek judicial review of, the adequacy of the environmental impact report for the project." (Senate Bill 743, § 2(c)-(h).)

the City's interest in preserving the viability of the Crocker Art Museum and establishing a new program to support the arts and culture in Sacramento. The budget resolution for the loan forgiveness does not mention the downtown arena project. For lack of analysis on how forgiveness of a loan for rights to a parking lot already owned by the City demonstrates premature commitment by the City to the downtown arena project, we deem the assertion forfeited. (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.)

In any event, as with the 600 block of K Street, mere site acquisition of the rights to the X and Y parking lots does not demonstrate premature commitment of the City. "Guidelines section 15004, subdivision (b)(2)(A), makes clear that a public agency may designate a preferred site for facilities requiring CEQA review, and enter into agreements to acquire the site, so long as future use of the site is conditioned on CEQA compliance." (*Golden Gate Land Holdings*, *supra*, 215 Cal.App.4th at p. 379.)

In sum, Saltonstall has not shown the record contains any evidence of premature commitment by the City to the downtown arena project in violation of CEQA.

### III

### *Sleep Train Arena Remodel as a Project Alternative*

Saltonstall argues the City's environmental review was deficient because the City did not study remodeling the current Sleep Train Arena as a project alternative. We reject the argument.

### A.

### *Project Alternatives Considered by the City*

The City's objectives for a new arena included the goals to: "Develop an entertainment and sports center project that connects with and enhances downtown from the waterfront to the Convention Center and from the Capitol to the Railyards and intermodal facilities. [¶] . . . Establish a framework for successful development

25

surrounding Downtown Plaza.  [¶] . . . Leverage the entertainment and sports center to develop our workforce and local businesses and help spark redevelopment of underutilized downtown properties throughout the Central Business District."

The Sleep Train Arena, by contrast, is located in a suburban setting approximately six miles north of the Downtown Plaza.  Building the new arena next to the current Sleep Train Arena would not have met the City's project objectives to revitalize the economic and social activity in the area surrounding the Downtown Plaza.  Nonetheless, the City's environmental review considered alternatives at the Natomas location of the Sleep Train Arena.

In total, the City studied four alternatives to the downtown arena project.  First, the City considered the no project alternative of continuing to operate the Sleep Train Arena without substantial change.  Second, the City studied construction of the new arena at the Railyards location a short distance to the north of the Downtown Plaza.  Third, the City considered the possibility of building a new arena next to the Sleep Train Arena, and demolishing the old arena upon completion of the new one.  The City also studied a reduced scale for building at the Downtown Plaza.

The City did not study remodeling the Sleep Train Arena as an alternative.  In rejecting remodeling of the Sleep Train Arena as an alternative, the City explained that "[t]he Draft EIR considers two alternatives at the Natomas site.  Alternative 1, No Project Alternative, assumes the Sleep Train Arena would continue to operate at its current location in Natomas.  No improvements beyond standard maintenance and minor upgrades are assumed under the No Project Alternative.  [¶]  Building a new [arena] at the Natomas site, next to the existing arena, is fully analyzed as Alternative 3.  Under this alternative, the existing arena would be demolished.  Many of the impacts of remodeling the existing arena would be similar to building a new arena at the same site, because

26

attendance and the type of events would be similar.  The impacts of demolition would be reduced, but not entirely eliminated because a major overhaul would require removal of some existing materials.  The relationship to the project objectives for a remodeled Natomas arena also would be similar to that of a new ESC at the Natomas site.  Evaluating an alternative in which the existing Natomas arena is remodeled would not add substantially to the alternatives analysis regardless of the cost of remodeling relative to building a brand new arena in the same location."

As the City explained, alternatives at the Natomas location failed to satisfy many of the City's objectives for the project:  "Locating the [arena] in Natomas would not catalyze redevelopment of previously blighted areas, because it would essentially replace an existing facility.  It is unlikely that [a new arena] in Natomas would become a world-class destination given the lack of supporting amenities (e.g., lodging, restaurants, other urban attractions such as museums) in the vicinity of the site.  [¶]  The Natomas site is not well served by public transportation, with only limited bus service and no light rail or train service in the immediate vicinity.  The site is not likely to become a multimodal place, because the distance to homes, restaurants and other employment centers is too far to be conducive to walking, biking and/or taking transit to events at the [new arena].  Attendees at the current Sleep Train arena rely overwhelmingly on automobiles to travel to events and this would be likely to continue given the transportation infrastructure.  [¶]  A number of objectives are tied directly to locating the [new arena] in the downtown area, including development of 1.5 million square feet of mixed-use space at the Downtown Plaza, establishing a framework for successful development of the Downtown Plaza, connecting with and enhancing downtown from the waterfront to the convention center, and sparking redevelopment of underutilized properties in the Central Business District.  These objectives would not be met by Alternative 3 due to its location."

27

The City also deemed the alternative of building a new arena next to the Sleep Train Arena to be infeasible due to floodplain issues. As the City's draft EIR explained, "The primary concern with the Natomas location relates to requirements for new construction in floodplains. Based on the FEMA FIRM maps, Sleep Train Arena is located at a base flood elevation of 33 feet. If the Natomas [arena] were to be constructed before flood control measures improve conditions, the building would need to have the lowest floor, including basement, elevated to at least 34 feet, or (i) be dry flood-proofed below the elevation required for the lowest floor . . . ; (ii) have structural components capable of resisting hydrostatic and hydrodynamic loads and effects of buoyancy; and (iii) be certified by a qualified registered professional engineer or architect . . . . It is reasonable to assume that these requirements would not be feasible, and that the result would be a delay in project construction." (Fn. omitted.) Thus, the draft EIR concluded that "due to the status of the floodplain building regulations, the [new arena] may not be able to be feasibly built in Natomas by the deadline set by the NBA."

By contrast, the Downtown Plaza site lies outside the 100-year floodplain. Consequently, "[t]he structures on the Downtown project site would be resilient to floods, high winds, and hail storms, even if such events are more frequent in the future."

**B.**

*Review of Project Alternatives under CEQA*

The proper preparation of an EIR lies at the "heart" of CEQA's requirements for environmental review of a proposed project. (*Laurel Heights I, supra*, 47 Cal.3d at p. 392. In turn, "[t]he core of an EIR is the mitigation and alternatives sections. The Legislature has declared it the policy of the State to 'consider alternatives to proposed actions affecting the environment.' (. . . § 21001, subd. (g); *Laurel Heights, supra*, 47 Cal.3d at p. 400.)" (*Goleta, supra*, 52 Cal.3d at pp. 564-565.) A public agency need not

consider every imaginable alternative to a project, but only feasible alternatives. (§ 21002.)

For purposes of CEQA, a feasible alternative is one " 'capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors.' (. . . § 21061.1; Guidelines, § 15364; *Laurel Heights, supra*, 47 Cal.3d at p. 402, fn. 10; *Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco* (1980) 106 Cal.App.3d 893, 910.) Both the California and the federal courts have further declared that '[t]he statutory requirements for consideration of alternatives must be judged against a rule of reason.' (*Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco, supra*, 106 Cal.App.3d at p. 910; *Village of Laguna Beach v. Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1028–1029; *Vermont Yankee Nuclear Power Corp. v. NRDC* (1978) 435 U.S. 519, 551, 55 L.Ed.2d 460; *Coalition for Canyon Preservation v. Bowers* (9th Cir. 1980) 632 F.2d 774, 783.)" (*Goleta, supra*, 52 Cal.3d at p. 565, internal reference to fn. omitted.)

Despite the requirement to study feasible alternatives, "CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose." (*Goleta, supra*, 52 Cal.3d at p. 566.)

The ultimate value of an EIR is to serve as an informational document giving the decisionmaking public agency sufficient information to assess the environmental consequences of a project, possible mitigation measures to reduce or eliminate adverse environmental consequences, and the availability of feasible alternatives to the proposed project. " 'The purpose of an EIR is to give the public and government agencies the information needed to make informed decisions, thus protecting ' "not only the

29

environment but also informed self-government.' " ' " (*Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 925-926, quoting *In re Bay-Delta Programmatic Environmental Impact Report Coordinated Proceedings* (2008) 43 Cal.4th 1143, 1162–1163.) Thus, "[a]n EIR need not consider every conceivable alternative to a project or alternatives that are infeasible." (*Tracy First, supra,* at pp. 925-926.) As a corollary, infeasible alternatives that do not meet project objectives need not be studied even when such alternatives might be imagined to be environmentally superior. Tasked with the study of a proposal to build a new shopping center, a public agency need not study a fruit stand as an alternative.

A public agency's decision regarding which project alternatives to study must be made "with 'the ultimate objective being whether a discussion of alternatives "fosters informed decision-making and informed public participation." ' (*Save Our Residential Environment v. City of West Hollywood* (1992) 9 Cal.App.4th 1745, 1751.) In assessing the claim that exclusion of off-site alternatives renders the EIR defective, the question is whether the range of alternatives 'is unreasonable in the absence of the omitted alternatives.' (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act [(Cont.Ed.Bar 2d ed. 2009)], § 15.17, p. 747.)" (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 992.)

## C.

### *Omission of Sleep Train Arena Remodeling as a Project Alternative*

As Saltonstall acknowledges, the City studied Natomas-based alternatives at the location of the Sleep Train Arena. Given the Sleep Train Arena's location "in a suburban setting, surrounded by a large parking lot, low-density office buildings and two- to three-story multifamily homes," the City concluded that carrying out the project at that location "would not catalyze redevelopment of previously blighted areas because it would

essentially replace an existing facility."  As the City's draft EIR noted, "[m]any of the project objectives are aimed at creating an active, multi-faceted community attraction that enlivens the surrounding area that embodies smart growth principles.  The Natomas . . . site is not conducive to these objectives . . . ."

In approving the project at the site of the Downtown Plaza, the city council adopted a statement of overriding considerations reiterating that the Natomas location had been rejected because building a new arena there "would achieve few of the project objectives, and fail entirely to achieve those related to location.  Under [this alternative], a state-of-the-art entertainment and sports center (ESC) with approximately 17,500 seats . . . could serve as the long-term home of the NBA Sacramento Kings.  The [new arena] would be located on a site that could be readily assembled, and that should not have extensive budget issues.  However, due to the status of the floodplain building regulations, the [new arena] may not be able to be feasibly built in Natomas by the deadline set by the NBA."

So too, the no project alternative did not meet the City's objectives to revitalize the area surrounding the Downtown Plaza.  Even assuming the Sacramento Kings continued to play at the Sleep Train Arena, the no project alternative would not meet the location objectives and neither would a new arena in the same Natomas location. Moreover, the no project alternative also would not meet the City's objectives to build a world-class entertainment center in the region.  Thus, even though the no project alternative might have been environmentally superior, it did not meet any of the City's objectives.

As with the no project alternative, a remodeled Sleep Train Arena might be an environmentally superior option that does not meet many or all of the City's objectives for the project.  The Natomas location would not spark redevelopment of the Sacramento

31

downtown; tie together the City's waterfront, Railyards area, and convention center; or stimulate new job and business creation in an underutilized location. Thus, even if the same concerns of floodplain permitting did not apply to a remodel alternative as they would a new Natomas arena alternative, the City was not required to study yet another alternative for the project in Natomas. As the draft EIR explained, many of the impacts of remodeling would have been similar to those of building a new arena in Natomas because existing material would need to be removed and remodeling would be extensive. The similarities in impacts meant studying the remodeling alternative would not have added substantially to the alternatives analysis in the City's EIR review. Consequently, the draft EIR sufficiently studied no project and new arena alternatives for the Natomas location.

The City approved the downtown arena project having sufficiently considered alternatives in Natomas. Additional study of a remodeled Sleep Train Arena alternative would not have provided any additional information required by CEQA for purposes of environmental review. Accordingly, the City's EIR process was not defective for not studying a remodeled Sleep Train Arena alternative.

## IV

### *I-5 Freeway Congestion Analysis*

Saltonstall next contends the City did not properly study the traffic impact of the downtown arena project on I-5, which is located close to the selected project site. While Saltonstall acknowledges the City did study local I-5 traffic congestion, she contends the study was inadequate for not considering I-5 traffic ranging from Canada to Mexico. Saltonstall also asserts the City's traffic study was deficient because the EIR understated the number of persons who would surround the downtown arena. We are not persuaded.

## A.

### *The City's Review of Traffic Conditions*

The downtown arena is designed for a maximum capacity of 17,500 seats. On "rare occasions," an additional 1,000 to 2,000 attendees may be accommodated in standing-room-only spaces "in the Main Concourse, the Upper Concourse, or cordoned portions of the entry plaza." However, as the draft EIR explained, "[t]he types of events that could attract such crowds would include such infrequent events as the Olympics, NBA Finals games, a national political convention, or extremely rare major concerts. Data collected by the [Sacramento] Kings reflects the infrequency of such events. In a survey of 13 other arenas in similar-sized cities around the country, out of over 1,000 events, only 3 had attendance over 18,000. In the event that one of these infrequent events were to be planned for the Proposed ESC, the applicant would coordinate with the City on event traffic management, crowd management, as well as other related event planning. Because of the infrequency of these events, they are not evaluated further in this EIR." The draft EIR analyzed crowd impacts using estimates that exceeded by several hundred attendees the highest average sell-out attendance at Sacramento Kings games during past years (assumed to be 16,750 per game).

Regarding crowds at the downtown arena, the final EIR explains that "[f]or a sold-out NBA game, approximately 15,900 attendees will walk through one of the four gateways around the [downtown arena] both before and after a game. These attendees will walk to off-site parking facilities, transit stops, nearby commercial establishments, and/or nearby residences. The remaining 1,600 attendees will walk from the arena directly into the 700 spaces of parking provided on the ESC site that is dedicated for premium ticket holders." Crowds are unlikely to congregate or linger outside around the time of the basketball games. As one of the designers of the downtown arena noted,

33

"because of when basketball occurs . . . principally in the winter time, because of the weather and because this was an outdoor area, [the outdoor plaza] might not be used as much as we would like."

As to the study methodology for freeway congestion, the draft EIR adopted the "procedures described in the Highway Capacity Manual" published by the Transportation Research Board in its December 2010 edition of the *Highway Capacity Manual*. The City applied this methodology to data on mainline I-5 traffic gathered by Caltrans. Based on the data and methods used, the draft EIR concluded traffic on parts of I-5 would achieve an "F" level of service rating -- the worst rating for traffic congestion.

The draft EIR disclosed that worsened traffic conditions on I-5 would result from the project as follows: "The addition of project trips would cause the following significant impacts to Caltrans freeway facilities: [¶] • Existing [level of service] F operations during the AM peak hour on the northbound 1-5 weave section between P Street and J Street would be worsened to a significant degree (based on the amount of project traffic added). [¶] • The 1-5 northbound weave section between I Street and Richards Boulevard would worsen from [level of service] E to F during the PM peak hour. [¶] • Existing [level of service] F operations during the PM peak hour on the northbound 1-5 weave sections between Richards Boulevard and West El Camino Avenue would be worsened to a significant degree (based on the amount of project traffic added). [¶] The degraded operation of these segments is considered a ***significant impact***."

Caltrans responded to the draft EIR's discussion of traffic impacts to "*concur* with the impacts to State transportation facilities as stated in the project [draft ]EIR" (italics added), including the description of I-5 congestion in "Impact 4.10-2: The Proposed Project would worsen conditions on freeway facilities maintained by Caltrans." Caltrans

also wrote to "*agree* with net volume traffic data as identified in the [draft ]EIR . . . of an increase of about 1,100 trips on southbound I-5 between 1-80 and J Street, and a net volume increase of about 1,375 trips on westbound state route (SR) 160 between Del Paso Blvd. and Richards Blvd." (Italics added.)

However, Caltrans stated its "analysis shows further effects of the additional PM peak hour traffic volumes that will occur on I-5 and SR 160 freeways near the project due to current congestion conditions in the area. Currently, southbound I-5 is operating at [level of service] 'F' during the PM peak hours between Garden Highway to the southbound I-5/eastbound US 50 connector due to the bottleneck on US 50 known as the 'W/X' freeway section. Queuing and spillback will not only occur in the auxiliary lane of I-5 as stated page 4.10-l of the [draft ]EIR, but our analysis shows that vehicle congestion and stop and go conditions are expected to extend to the I-5/I-80 connector and beyond. In addition, the section of westbound I-80 nearby the I-5/I-80 connector would experience congestion due to queuing." Caltrans's response did not include the analysis, but only the conclusion drawn from it.

The City's final EIR responded to Caltrans's comment on traffic impacts to I-5 to acknowledge that Caltrans's "comment reflects agreement with the net volume traffic data as identified in the Draft EIR, but also indicates that Caltrans analysis shows further effects of additional PM peak hour traffic would occur on I-5 and SR 160 due to current congestion conditions in the area." The City noted its methodology and data showed "that southbound I-5 currently experiences vehicle queuing caused by congestion at the 'W-X' freeway connector that spills back to J Street and beyond. [¶] The transportation impact analysis results indicate that queued vehicles are not expected to spill back to the I-80/I-5 interchange as suggested in the comment." The final EIR noted that "it was not

possible to review" the Caltrans comment further because "an analysis was not presented in the letter."

Approval of the project by the city council was conditioned on a mitigation measure requiring further coordination by the City "with Caltrans, as necessary, to implement the following measures to benefit operations at the J Street/3rd Street/I-5 off-ramps intersection" to address peak congestion in the morning and during pre-event peak hours. The city council also adopted a fair share payment mitigation measure. And, the city council found "that there are no additional feasible mitigation measures or alternatives that the City Council could adopt at this time which would reduce this impact to a less-than-significant level. **For these reasons, the impact remains *significant and unavoidable*.**"

In approving the project, the city council adopted a statement of overriding considerations regarding I-5 traffic congestion as follows: "Although payment of the fair share contribution would assist in mitigating the Project's mainline freeway impacts, the impacts may not be fully mitigated with the planned transportation improvements and the timing and funding for the improvements are uncertain. Payment of the fee does not ensure that the Project's impacts on the 1-5 freeway would be fully mitigated. The City Council finds that there are no additional feasible mitigation measures or alternatives that the City Council could adopt at this time which would reduce this impact to a less-than-significant level. **For these reasons, the impact remains *significant and unavoidable*.** [¶] To the extent that this adverse impact will not be eliminated or lessened to an acceptable (less-than-significant) level, the City Council finds that specific economic, legal, social, technological, and other considerations identified in the Statement of Overriding Considerations support approval of the Project as modified, despite unavoidable residual impacts."

36

## B.

### *Adequacy of an EIR's Study of Potential Environmental Effects*

An EIR must suffice to inform the decision-making public agency about the environmental consequences of approving a project. (*Laurel Heights I*, *supra*, 47 Cal.3d at p. 393.) However, as the California Supreme Court noted in *Laurel Heights I*, "[a] project opponent or reviewing court can always imagine some additional study or analysis that might provide helpful information. It is not for them to design the EIR. That further study . . . might be helpful does not make it necessary." (*Id.* at p. 415.) Thus, we " 'must uphold an EIR if there is any substantial evidence in the record to support the agency's decision that the EIR is adequate and complies with CEQA. [Citation.] [¶] CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive.' " (*El Morro Community Assn. v. California Dept. of Parks & Recreation* (2004) 122 Cal.App.4th 1342, 1349, quoting *Defend The Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1265.)

In reviewing the sufficiency of an EIR, our "task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated. We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so. Our limited function is consistent with the principle that 'The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind.' " (*Laurel Heights I*, *supra*, 47 Cal.3d at p. 393, quoting *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283.) Accordingly, the deferential standard of review for substantial evidence "applies to challenges to the scope of an EIR's analysis of a topic,

the methodology used for studying an impact and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions. (*Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1259 (*Hillside*).)" (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1198.)

## C.

### *Substantial Evidence Supports the City's Traffic Study Methodology and Factual Conclusions Regarding the Extent of Traffic Congestion*

Saltonstall mounts a challenge to the factual sufficiency of EIR traffic analysis that we review under the deferential substantial evidence standard. Saltonstall wants a more comprehensive review of traffic congestion on the section of I-5 adjacent to the downtown arena project. Saltonstall faults the City for not considering the effects of the project on interstate travelers with origins as far as Canada and destinations as remote as Mexico. She also argues that the City rejected Caltrans's "repeated efforts to 'participate meaningfully' in addressing the project's traffic impacts," and the City "buried" in tiny footnotes its conclusions about how traffic would be worsened.

The City's draft EIR studied and disclosed existing problems with the nearby section of I-5 at peak traffic times as well as how the downtown arena project would worsen traffic congestion. The EIR sets forth the basis for its methodology and the source of its factual data regarding traffic on I-5. The draft EIR reached the conclusion that levels of service would -- at times -- reach the worst rating given by Caltrans for traffic flow. Even with proposed mitigation measures, the City acknowledged the adverse impact of the downtown arena project on I-5 traffic would be significant and unavoidable.

The draft EIR clearly, and in normal typeface, articulates problems with current traffic congestion and expected worsening of traffic on I-5. Rather than drawing objection from Caltrans, that agency commented on the draft EIR to note it agreed with the methodology of the City's traffic study. Caltrans also "reviewed and approved a methodology proposed by the City to calculate the fair share fee." Caltrans further agreed with the City that possible mitigation measures were limited by the physical constraints of I-5 near the project site. True, Caltrans informed the City that congestion from events held at the downtown arena would adversely affect I-5 all the way to the interchange with I-80. However, Caltrans did not include the analysis for reaching its conclusion about the extent of traffic congestion on I-5.

The City was entitled to rely on the methodology and conclusions it articulated in its draft EIR because it had the prerogative to resolve conflicting factual conclusions about the extent of traffic congestion that would result from the downtown arena project. (*Laurel Heights I*, *supra*, 47 Cal.3d at p. 393.) For the same reason, the City did not violate CEQA by rejecting Saltonstall's suggestion that the traffic study in the draft EIR was defective for failure to consider mainline traffic. "The discussion of alternatives need not be exhaustive, and the requirement as to the discussion of alternatives is subject to a construction of reasonableness." (*Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco* (1980) 106 Cal.App.3d 893, 910.) CEQA "does not demand what is not realistically possible, given the limitation of time, energy and funds, 'Crystal ball' inquiry is not required." (*Ibid.*)

We also reject Saltonstall's assertion the City did not properly study mainline traffic. Essentially, Saltonstall argues the flaw in the City's EIR is that it did not separately study motorists who are stuck in the *same* traffic, on the *same* freeway, going in the *same* direction, at the *same* time, based only on the fact these interstate motorists

39

are traveling a greater distance. The City was not required to separately study the effect on interstate motorists who will be impacted in the same way as other, local motorists sharing the same section of I-5. Moreover, we note the EIR did account for mainline traffic because it used the sampling data of mainline freeway traffic collected by Caltrans.

We are not persuaded by Saltonstall's contention that the EIR understates the size of crowds attending events at the downtown arena. The City's review of crowd size included a national survey of similar entertainment and sports facilities as well as review of crowd sizes during the Sleep Train Arena's history. The City's draft EIR used numbers in excess of historical attendance figures. Although Saltonstall speculates greater numbers will congregate outside the downtown arena, the draft EIR contains substantial evidence to the contrary. While she may dispute the City and trial court's "common sense" conclusion that large crowds of non-patrons will not stand in the cold and dark during Sacramento Kings games, this conclusion is reasonable in light of past seasons at the Sleep Train Arena. "Common sense in the CEQA domain . . . is an important consideration at all levels of CEQA review." (*Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 175.) The City did not err in declining to speculate that the same games played a few miles away would suddenly and inexplicably draw large crowds of persons who would not watch the game but simply mill about in the winter nighttime.

The City's EIR analysis of traffic congestion on I-5 was not deficient under CEQA.

## V

### *Crowd Safety*

Saltonstall next contends the City's environmental review was deficient because "[t]he EIR fails to address substantial evidence in the record -- from the City's own

40

police force -- of significant potential impacts *to safety by event crowds*." (Italics added.) Saltonstall argues the EIR both understates the number of persons who can be expected to congregate around the downtown arena as well as their proclivities toward drunken violence. We reject the argument because Saltonstall does not show how the safety of persons at the site of the downtown arena must be considered in an EIR studying *environmental* effects of the project. Moreover, the EIR's conclusions about the size of crowds inside and around the downtown arena are supported by substantial evidence in the administrative record.

### A.

### *Planning for Crowds at the Downtown Arena*

The City's draft EIR concluded the downtown arena "would increase demand for police protection services within the City of Sacramento. [¶] The Sacramento Sheriff's Department currently provides interior and exterior security at Sleep Train Arena during events, and also manages ingress and egress traffic patterns before and after Sacramento Kings games. The Sacramento PD would be responsible for interior and exterior security at the proposed ESC, and for implementation of the Proposed Project's traffic management plan (TMP) before, during, and after certain events. . . . [¶] . . . [¶] The Sacramento PD does not anticipate that new police facilities would be required to ensure adequate police protection for the Proposed Project. Sacramento PD would adjust staffing levels as appropriate in order to ensure adequate service at the Proposed Project site. The Proposed Project would not require the construction of new or altered police facilities, and the impact to police services would be ***less than significant.***" (Fns. omitted.)

This conclusion was supported by statements given during the environmental review process by the City's fire marshal and representatives from the police department.

41

During a planning meeting, Michael Riley, the City's fire marshall, spoke to "highly endorse" the project on grounds the downtown arena will "have the level of fire protection . . . and emergency exits that it deserves." So too, police department officials noted "we're good with" the design after the planners "made the 7th and K [Street area] wider mainly because we think there's gonna be a lot of special events that are gonna go through there with the new arena. So, that was one of our concerns which is crowd flow for some of these big events. So, we're happy with what they've done and we think it's gonna work out well."

The trial court agreed with the EIR's conclusions regarding crowd size, stating that "[c]ommon sense should be sufficient to rebut any claim that the outdoor plaza will be filled to capacity with people during every [Sacramento] Kings game." The trial court concluded that "[s]peculation about potential crowd violence is not an impact that was required to be analyzed or mitigated as part of the EIR. (See [Guidelines,] § 15064(d)(3).) The EIR adequately considered the Project's impacts on public services."

### B.

### *CEQA Review is Limited to Environmental Impacts*

As a fundamental principle, " '[e]ffects analyzed under CEQA must be related to a physical change.' (Guidelines, § 15358, subd. (b).) A social or economic change in itself is not a significant effect on the environment. (Guidelines, §§ 15064, subd. (f)(6), 15382.) CEQA is not concerned with . . . direct social effects that do not contribute to a secondary physical impact. (See Guidelines, §§ 15064, subds. (e) and (f)(6), 15131, subd. (a), 15358, subd. (b); see also § 21060.5, Guidelines, § 15360.)" (*Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1206 (*Lighthouse*).) Nonetheless, EIR review under CEQA must consider indirect physical changes to the

42

environment. But "[a]n indirect physical change is to be considered only if that change is a reasonably foreseeable impact which may be caused by the project. A change which is speculative or unlikely to occur is not reasonably foreseeable." (Guidelines, § 15064, subd. (d)(3).)

## C.

### *No Evidence of Effect on the Environment*

Saltonstall does not establish how this issue of crowd safety impacts the physical environment. Instead, her argument focuses on allegations of "significant potential impacts *to safety* by event crowds." (Italics added.) Saltonstall's argument does not implicate an environmental issue that must be reviewed under CEQA. (*Lighthouse, supra,* 131 Cal.App.4th at p. 1206.)

We also reject Saltonstall's assertion that the City did not account for "the significant numbers who will loiter outside for 'free viewing' of the outdoor monitors." Review of the record shows outdoor viewing of events will be strictly constrained and actively managed. The draft EIR explains that, "for some events, a portion of the entry plaza in front of the ESC main entry *could be secured* and the adjacent exterior walls of the Main Concourse level opened to create an integrated indoor/outdoor experience *for ticketed attendees*. Video screens and speakers may be placed *in the secured entry plaza* area, allowing attendees to hear and see the activities going on inside the [downtown arena] while outside in the entry plaza area." (Italics added.) Far from showing that drunken masses will loiter in an outdoor viewing area, the record shows outdoor viewing will be limited to ticketed patrons in a secured area.

In arguing the City ignored concerns of its own police department regarding crowd control, Saltonstall cites an e-mail sent by Deputy Chief of Police Dana Matthes. The e-mail, however, shows Matthes was responding to questions rather than voicing concerns

43

of the police department. Matthes wrote to articulate the police department's "thoughts on the public vs private space issue along with our responses to your questions." The central point of Matthes's communication was that "[i]f the plaza area is deemed public space, the City will most likely be responsible for the programming of the space as well as addressing issues related to transients, camping, scalping, protestors, etc. Based on actions of other Cities, it appears environmental design along with city ordinances may mitigate most issues. [¶] If the plaza area is private, the owners have more control over the activities but with an easement, we aren't sure if this provides any benefit. Additionally, if they have problems with transients, camping, scalping, etc., and choose not to address the issues, it becomes more difficult for the City."

Matthes's response did not express *any* concerns about rioting, crowd violence, or any effect of the project on the environment. To the contrary, Matthes explained the Sacramento Police Department had learned from the police captain in charge of security at San Francisco's baseball park that even though "[t]he property around the stadium is public," "they do not have any major issues primarily due to ordinances enacted to address various social issues (camping, sleeping, scalping, protesting, etc.)." By requiring permits and bonds for various events, San Francisco essentially solved any social concerns arising out of activity surrounding its ballpark. Consequently, the tone of Matthes's letter expressed optimism that any of these social issues would be effectively handled by the police department.

Although Saltonstall makes passing reference to crowds spilling out onto the streets after downtown arena events, the record shows the issue of crowd entrance and exit from the venue was studied. City police and fire department representatives declared they approved of the design measures and traffic management plans for crowd

44

movements. And, the project includes mitigation measures to ensure crowd movements do not become a problem.

In sum, Saltonstall has not met her burden to show how the issue of crowd safety at the downtown arena constitutes a matter for CEQA review.

## VI

### *Saltonstall's Motion to Augment the Administrative Record*

Saltonstall contends the City erred in refusing to produce documents relating to the City's communications with the NBA regarding the project. She further argues the administrative record should have been augmented to include the Dangberg-Friedman e-mail and a 24-page City staff report pertaining to the City's forgiveness of a $7.5 million loan to the Crocker Art Museum. We conclude Saltonstall's argument regarding the NBA documents is not cognizable on appeal. Her argument regarding the Dangberg-Friedman e-mail and loan forgiveness report is deemed forfeited for lack of any meaningful analysis on the issue.

### A.

### *E-mail Communications with the NBA Requested under the Public Records Act*

Saltonstall contends the trial court's decision "should be reversed with instructions to obtain the complete record with the 62,000 e-mails." The 62,000 e-mails to which Salton refers were requested under the Public Records Act. The trial court denied Saltonstall's Public Records Act request on grounds the matter was not properly before the court.

The issue of Saltonstall's Public Records Act request is not properly before this court because review of the denial of such a request is only by petition for writ of mandate -- not direct appeal. (*Times Mirror Co. v. Superior Court* (1991) 53 Cal.3d 1325, 1333.) Accordingly, we do not consider Saltonstall's argument regarding the

administrative record to the extent it pertains to the 62,000 e-mails claimed to relate to communications between the City and the NBA.

## B.

### *Forfeiture*

Under well established principles of appellate review, "[t]o demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error. (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239, fn. 16; *In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 672-673, fn. 3.) When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' (*Atchley v. City of Fresno* [(1984)] 151 Cal.App.3d [635,] 647; accord, *Berger v. Godden* [(1985)] 163 Cal.App.3d [1113,] 1117 ['failure of appellant to advance any pertinent or intelligible legal argument . . . constitute[s] an abandonment of the [claim of error'].)" (*In re S.C., supra,* 138 Cal.App.4th at p. 408.) Saltonstall's conclusory assertions regarding documents that should have been included in the administrative record fail to properly tender the issue for appellate review.

Although Saltonstall asserts the administrative record should have been augmented with the Dangberg-Friedman e-mail and loan forgiveness report, she provides no analysis of why these two documents meet the definition of documents for inclusion in an administrative record under section 21167.6, subdivision (e). Her analysis as to the Dangberg-Friedman e-mail is limited to the assertion that the "June 3 email is required to be included in the administrative record pursuant to PRC §21167.6(e)(1), (3), (7) and (10)." Similarly, her analysis regarding the loan forgiveness report states only that "[t]he City should be ordered to augment the administrative record with the Crocker staff report pursuant to PRC §21167.6(e) subsections (2), (3), (8) and (10)." Saltonstall does not

46

explain how the Dangberg-Friedman e-mail and loan forgiveness report meet any of the definitions of documents the Public Resources Code requires to be included in an administrative record. The issue of these documents' inclusion in the administrative record is deemed forfeited for lack of any meaningful analysis. (*In re S.C.*, *supra*, 138 Cal.App.4th at p. 408.)

Moreover, Saltonstall ignores the *trial court's* conclusion that the Dangberg-Friedman e-mail and loan forgiveness report were not relevant and therefore not necessary parts of the administrative record. Saltonstall's focus on the *City's* actions in preparing the administrative record ignores the rule that "it is the trial court's determinations regarding the scope of the administrative record that are reviewable by the appellate court. Appellate courts do not review the agency's decision about what to include in the administrative record." (*Madera Oversight Coalition, Inc. v. County of Madera* (2011) 199 Cal.App.4th 48, 65, disapproved of by *Neighbors for Smart Rail v. Exposition Metro Line Const. Authority* (2013) 57 Cal.4th 439, 457.) And, our "review of a trial court's determinations regarding the scope of the administrative record is subject to the principle that appellate courts presume the trial court's order is correct." (*Madera,* at p. 66.) Consequently, Saltonstall's failure to address the trial court's conclusion regarding the relevance of the Dangberg-Friedman e-mail and loan forgiveness report would require affirmance of the trial court's denial of the motion to augment even if Saltonstall had not forfeited this issue.

## DISPOSITION

The judgment dismissing appellants' Adriana Gianturco Saltonstall, William Reany, Jeanie Keltner, Delphine Cathcart, Bob Blymyer, Helen Maggie O'Mara, J. Bolton Phillips, Kevin Coyle, Karen Redman, Ronald H. Emslie, Christine Hansen, and Sarah E. Foster's petition and the order denying their motion to augment the

administrative record are affirmed.  The City of Sacramento and Sacramento Basketball

Holdings, LLC, shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1)

& (2).)


                                                                HOCH          , J.


We concur:


        NICHOLSON      , Acting P. J.


            MAURO       , J.