Filed 11/6/15  City of Jurupa Valley v. City of Riverside CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| CITY OF JURUPA VALLEY, | B257623 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS143085) |
| v. | |
| CITY OF RIVERSIDE et al., | |
| Defendants and Respondents; | |
| SOUTHERN CALIFORNIA EDISON, | |
| Real Party in Interest and Respondent. | |

APPEAL from judgment of the Superior Court of Los Angeles County, Thomas I. McKnew, Jr., Judge.  Affirmed.

Peter M. Thorson, City Attorney (Jurupa Valley); Richards, Watson & Gershon, Ginetta L. Giovinco and Stephen D. Lee for Plaintiff and Appellant.

Allen Matkins Leck Gamble Mallory & Natsis, K. Erik Friess and Nicholas S. Shantar for Lennar Homes of California Inc. as Amicus Curiae on behalf of Plaintiff and Appellant.

Best Best & Krieger, Michelle Ouellette, Charity Schiller and Alisha M. Winterswyk for Defendants and Respondents and Real Party in Interest and Respondent.

_____

**INTRODUCTION**

In need of more electrical power for the growing City of Riverside population, Defendants and Respondents the City of Riverside (Riverside) and the Riverside Public Utilities Department (RPU) worked together with real party in interest Southern California Edison (Edison) to design the Riverside Transmission and Reliability Project (the Project). The Project involves the creation of a transmission line, two substations, and several subtransmission lines to deliver power throughout Riverside. Pursuant to the California Environmental Quality Act (CEQA), Riverside evaluated the environmental impact of the Project, made modifications in response to public comment, and approved the Project. Plaintiff and Appellant the City of Jurupa Valley opposed the Project through public comment during the environmental review and subsequently brought a mandamus action in superior court, which was denied. Jurupa Valley appeals from the superior court's denial of its mandamus petition.

On appeal, Jurupa Valley asserts that Riverside violated CEQA by (1) failing to recirculate the Final Environmental Impact Report (Final EIR) despite adding new information to it, (2) not fairly and in good faith analyzing Project alternatives, and (3) pre-committing to the Project. We affirm on all grounds. Substantial evidence supports Riverside's determination that recirculation was not required because the minor rerouting of the transmission lines did not result in increased or new, substantial environmental impacts. The administrative record also demonstrates that Riverside reasonably excluded the Eastern Route and undergrounding from the Project alternatives on the basis that they were infeasible and failed to meet the Project's objectives. Lastly, the record does not indicate that Riverside committed itself to the Project so as to effectively preclude any alternatives or mitigation measures that CEQA would otherwise require to be considered.

**FACTS AND PROCEDURAL BACKGROUND**

Edison currently delivers electrical power to the City of Riverside via a single transmission line connected to the surround grid at Edison's Vista Substation, which is operated by the California Independent Systems Operator (CAISO, the independent

2

electrical grid operator for approximately 80% of California's power grid). Because Riverside's electricity needs have outstripped supply, Riverside and RPU have worked with Edison over the last decade to design a second connection to the transmission grid in order to provide more power to Riverside and to protect Riverside residents and businesses against the blackouts that occur whenever service from the Vista substation is interrupted. Studies prepared by Edison demonstrated that, at minimum, a double-circuit 220 kilovolt (kV) transmission line (operable at 230 kV) and a 220-66 kV transmission substation (operable at 230-69 kV) were needed to provide Riverside with a second electricity transmission source. In January 2006, the RPU Board recommended and the Riverside City Council approved an $800,000 appropriation for consultant Power Engineers to conduct a study of Project alternatives, environmental review of the Project pursuant to CEQA, and permitting. Additional appropriations were later approved by the City Council in order to complete the environmental review.

Also in 2006, Riverside conducted a Siting Study, assessing the feasibility of three possible routes (the Santa Ana River West Corridor, the Central Corridor, and the Santa Ana River East Corridor) for the main transmission line. Through this study, Riverside determined that the Eastern Route was not feasible due to public safety, structural stability, and environmental concerns. Riverside used this study to define the scope of the Project and its alternatives for the EIR.

In August 2011, Riverside issued the Draft EIR. The Draft EIR defined the Project as involving the creation of a 230 kV transmission line (a portion of which would lie within the city limits of the City of Jurupa Valley), two new substations, and several 69 kV subtransmission lines to deliver power to areas throughout Riverside. Within the EIR, Riverside excluded the Eastern Route as an alternative based on its findings from the Siting Study and a preliminary geotechnical evaluation of the potential routes made by Edison. Riverside also determined that it was not feasible to underground the 230 kV or the 69 kV lines because undergrounding provided solely aesthetic benefits, while costing many times more than overhead lines and while causing greater environmental impacts.

Riverside subsequently issued a Final EIR, responding to comments and making minor modifications to the Project in response to public concerns. In reaction to a shopping center's concerns regarding the 230 kV transmission line running through its parking lot, Riverside rerouted the transmission line to run along the backside of the shopping center. Responding to significant safety concerns, Riverside decided to underground a half-mile stretch of 69 kV transmission line, which paralleled the Riverside Municipal Airport and would have otherwise obstructed flight paths. Riverside informally accepted and responded to additional comments regarding the Final EIR, and subsequently approved the Project, issuing a statement of overriding considerations.

Jurupa Valley opposed the Project through public comment during the environmental review and subsequently brought a mandamus action in superior court. In its petition for a writ of administrative mandamus, Jurupa Valley argued in part that Riverside violated CEQA by not recirculating the Final EIR after adding new information to it, failed to properly analyze Project alternatives, and pre-committed to the Project. The court denied the petition, finding that the Final EIR did not require recirculation, Riverside reasonably considered Project alternatives, and that Riverside did not pre-commit to the Project. Jurupa Valley now appeals.

## DISCUSSION

Jurupa Valley makes three main arguments regarding the City's compliance with CEQA. First, Jurupa Valley argues that Riverside failed to comply with CEQA because Riverside added significant new information to the Final EIR, which included altering the route of transmission lines in two places, without re-circulating the Final EIR for public review, public comment, and responses to those comments. Second, Jurupa Valley asserts that Riverside did not fairly and in good faith evaluate Project alternatives, specifically undergrounding portions of the transmission lines and running the 230 kV transmission line along a different route to the east. Third, Jurupa Valley argues that Riverside impermissibly pre-committed to the Project as evidenced by statements made by RPU, CAISO's approval of the Project, Riverside's pre-selection of a preferred route, Riverside's Interconnection Facilities Agreement with Edison, Riverside's commitment

4

of funds to the Project, and decision to underground a portion of the 69 kV subtransmission line despite findings that it was infeasible.

As in other mandamus cases, we review the agency's action, not the trial court's decision. Our standard of review of the administrative record is the same as the trial court's standard. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 (*Vineyard*).) We review legal errors, like pre-commitment, de novo. (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 131 (*Save Tara*).) We review the lead agency's factual determinations, like the agency's decision not to recirculate the Final EIR and choice of Project alternatives, for substantial evidence. (*Vineyard,* at p. 427; *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1135 (*Laurel Heights II*); *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1161-1162 (*Bay-Delta*).) " 'Substantial evidence is defined as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." ' [Citations.] Substantial evidence is not '[a]rgument, speculation, unsubstantiated opinion or narrative, evidence which is clearly inaccurate or erroneous, or evidence of social or economic impacts which do not contribute to, or are not caused by, physical impacts on the environment . . . . Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts.' " (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184,1198, citing Pub. Resources Code, § 21082.2, subd. (c); Guidelines, § 15384, subds. (a) & (b).[1])

---

[1] All references to "Guidelines" are to the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.). Courts "should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 (*Laurel Heights I*).)

## 1.    The Final EIR Did Not Require Recirculation

First, Jurupa Valley argues that Riverside failed to comply with CEQA because Riverside added significant new information to the Final EIR by altering the route of transmission lines in two places without re-circulating the Final EIR for public review, public comment, and responses to those comments.

"With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment." (*Laurel Heights I, supra,* 47 Cal.3d at p. 390.)  "An EIR is an informational document which provides detailed information to the public and to responsible officials about significant environmental effects of a proposed project. [Citations.]  It must contain substantial evidence on those effects and a reasonable range of alternatives . . . ." (*Goleta Union School Dist. v. Regents of University of California* (1995) 37 Cal.App.4th 1025, 1030.)  When preparing an EIR, the lead agency must provide the draft EIR to the public and afford the public a period of time to review the draft EIR and submit comments.  (Pub. Resources Code, § 21092; *Laurel Heights II, supra,* 6 Cal.4th at p. 1123.)  The agency must then evaluate the public comments it receives and prepare a written response.  (Guidelines, § 15088, subd. (a).)  "The response to comments may take the form of a revision to the draft EIR or may be a separate section in the final EIR." (*Id*., subd. (d).)  Given the requirement of providing written responses to public comments, "the final EIR will almost always contain information not included in the draft EIR." (*Laurel Heights II,* at p. 1124.)

CEQA requires notice and recirculation for public review and comment of an EIR when "significant new information is added" to the EIR after the public comment period has closed but before certification.  (Pub. Resources Code, § 21092.1.)  In *Laurel Heights II*, the Supreme Court concluded that "the addition of new information to an EIR after the close of the public comment period is not 'significant' unless the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a *substantial* adverse environmental effect of the project or a feasible way to mitigate or avoid such an

6

effect (including a feasible project alternative) that the project's proponents have declined to implement." (*Laurel Heights II, supra,* 6 Cal.4th at p. 1129.)

The Supreme Court explained: "recirculation is not required where the new information added to the EIR 'merely clarifies or amplifies [citations] or makes insignificant modifications in [citation] an adequate EIR.' [Citation.] On the other hand, recirculation is required, for example, when the new information added to an EIR discloses: (1) a new substantial environmental impact resulting from the project or from a new mitigation measure proposed to be implemented [citation]; (2) a substantial increase in the severity of an environmental impact unless mitigation measures are adopted that reduce the impact to a level of insignificance [citation]; (3) a feasible project alternative or mitigation measure that clearly would lessen the environmental impacts of the project, but which the project's proponents decline to adopt [citation]; or (4) that the draft EIR was so fundamentally and basically inadequate and conclusory in nature that public comment on the draft was in effect meaningless [citation]." (*Laurel Heights II, supra,* 6 Cal.4th at pp. 1129–1130.)

At issue is whether two changes regarding the route of transmission lines constituted "significant new information" such that the EIR required recirculation pursuant to CEQA. The first change involved Riverside undergrounding a half-mile portion of a 69 kV subtransmission line located next to the airport due to safety risks to air traffic. The second change involved altering the route of the 230 kV transmission line to run along the backside of the Vernola Marketplace shopping center rather than through the shopping center's parking lot. We address each change to the EIR in turn.

      a.    <u>Undergrounding a Half-Mile Portion of the 69 kV Subtransmission Line</u>

Jurupa Valley contends that undergrounding the half-mile portion of the 69 kV line adjacent to the Riverside Airport created "new environmental impacts and a substantial increase in existing environmental impacts." Specifically, Jurupa Valley argues that undergrounding this small portion of 69 kV line would result in greater and new impacts to air quality, land use disturbance, traffic, noise, biology, water and hydrology, and economics that were not contemplated in the Draft EIR.

7

We disagree. The Final EIR demonstrated that undergrounding this half-mile stretch of subtransmission line would not have a new substantial environmental impact or a substantial increase in the severity of an environmental impact. As to the construction associated with undergrounding, the Final EIR indicates that the Draft EIR had already considered and accounted for the environmental impacts associated with 60 days of underground construction a 69 kV subtransmission line in anticipation of a possible scenario where a portion of one such line required undergrounding. The Final EIR explicitly stated:

> "Construction estimates presented in the DEIR included a contingency for up to 60 days of underground construction work for the 69 kV subtransmission line between RERC and Harvey Lynn/Freeman Substations. This contingency was based on design assumptions that included 'worst-case' project planning and allowed for a very conservative over-estimate of analyzed air quality emissions to be presented in the DEIR. As a result, mitigative undergrounding stipulated by [the Airport Land Use Commission] and other modifications did not require additional air quality analysis, because project changes and their associated air emissions changes were already captured within the original analysis boundaries."

Table 2.5-2 within the second chapter of the Draft EIR accounts for the construction impacts associated with the 60 days of undergrounding a 69 kV line. The environmental analysis in Chapter Three of the Draft EIR also accounts for this "worst-case" scenario. In discussing emissions, Chapter Three of the Draft EIR similarly stated that it analyzed "worst case emissions resulting from [the] Proposed Project construction and assume[d] that the peak emitting construction activities from each construction location occur on the same day." The EIR stated that with mitigative measures, including staggering the construction work, the emissions were reduced to insignificant levels.

The Final EIR indicates that the construction associated with a half-mile of undergrounding the 69 kV could be accomplished within the 60 days of undergrounding allotted in Draft EIR. Because the Draft EIR already accounted for the environmental impacts associated with undergrounding the transmission line adjacent to the airport, the construction related to this change to the EIR did not result in a new substantial

8

environmental impact or a substantially increased environmental impact. This aspect of the EIR did not require recirculation.

In addition, the Final EIR indicated that post-construction, the underground 69 kV subtransmission line would not cause additional or increased environmental impacts. The Final EIR explained that the cables used for undergrounding would not cause any significant environmental impact because they "cannot leak fluids into the surroundings, if damage to cables occur." The Final EIR stated that there would not be a permanent land disturbance caused by undergrounding, and that aesthetic impacts would be less than significant because the line would be below ground. Contrary to Jurupa Valley's contentions, there would be no impact to "waters or wetlands because the undergrounding would occur within disturbed areas and existing road [right of ways]." Most importantly, the Final EIR reported that undergrounding the small stretch of subtransmission line would eliminate a previously significant danger to air traffic. Thus, having this particular portion of subtransmission line underground reduced aesthetic impacts, reduced airplane safety impacts, and did not result in new or increased impacts to the environment.

In sum, the administrative record provides substantial evidence supporting Riverside's determination that recirculation was not required because this minimal amount of undergrounding did not result in a new substantial environmental impact or a substantial increase in the severity of an environmental impact.

b. Rerouting the 230 kV Behind Vernola Marketplace Shopping Center

Jurupa Valley also contends that a minor change in the placement of the 230 kV transmission line to avoid interference with the Vernola Marketplace shopping center parking lot will cause "substantial increase in traffic impacts" and that this modification required recirculation of the Final EIR. The Draft EIR planned for the 230 kV transmission line to run through the Vernola Marketplace parking lot. In response to public comment, including comments from Vernola Marketplace's owner who requested a modified route, Riverside reevaluated the original route through the parking lot and determined that "a minor routing refinement" was feasible, and would avoid or reduce

9

ground disturbance, interference with roadways, and aesthetic impacts. Thus, the Final EIR shifted the transmission line's route so that it ran along the backside of the Vernola Marketplace.

Jurupa Valley relies heavily on the Final EIR's statement that as a result of construction, "high traffic impacts" would occur on Limonite Avenue in arguing that Riverside was required to recirculate. Yet, these traffic impacts were already anticipated by the Draft EIR. Prior to rerouting the 230 kV line, the Draft EIR stated that "Construction of the 230 kV transmission line would create temporary impacts along approximately 0.4 miles of the transmission line route at Limonite Avenue and the Vernola Marketplace shopping center parking lot south of Limonite Ave. Temporary lane closures, detours and stoppages of traffic that may occur during construction activity are expected to create transportation operation impacts, such as fewer travel lanes, an increase in travel time, reduced speeds or stoppage of travel for motorists . . . entering, exiting and traveling within the shopping center parking lot." The Draft EIR stated that these potential temporary traffic impacts would be less than significant when mitigation measures were implemented.

The Final EIR indicated that the minor route modification of the 230 kV line would not change the fact that the transmission line would still cross Limonite Avenue, and that its construction would impact Limonite Avenue as set forth in the Draft EIR. The Final EIR reiterated much of the quoted language in the above paragraph, stating that: "[t]emporary lane closures, detours, and stoppages of traffic that may occur during construction activity are expected to create transportation operation impacts, such as lane reduction, delays in travel time, reduced speeds, or stoppage of travel for motorists." The Final EIR further stated that "[w]ith the proposed realignment of the 230 kV transmission line west of Vernola Marketplace, high traffic impacts on Limonite Avenue are anticipated in the vicinity of the northbound I-15 on- and off-ramps instead of the shopping center entry/exit points; however, the approximate length of Limonite Avenue would be affected by this realignment."

The Final EIR clearly indicated that traffic impacts on Limonite Avenue have not changed in a significant degree through this minor route alteration. Both the Draft and Final EIRs concluded that implementation of mitigation measures would reduce the traffic impacts to less than significant levels. Moreover, the Final EIR stated that this route change would reduce the length of the 230 kV transmission line, the amount of severe angles in the transmission line, total overhead structures, the number of lattice towers, and construction air emissions.

Thus, substantial evidence supported Riverside's decision not to recirculate the EIR as this change did not result in a new or a substantially increased environmental impact. Rather, this revision to the EIR reduced environmental impacts. We conclude that Riverside did not include significant new information in the Final EIR requiring recirculation.

## 2.    Riverside Sufficiently Analyzed Project Alternatives

Jurupa Valley asserts that Riverside did not fairly and in good faith evaluate two Project alternatives: undergrounding portions of the transmission lines and running the 230 kV transmission line along a different route to the east. "The core of an EIR is the mitigation and alternatives sections." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 (*Goleta*).) "CEQA requires that an EIR, in addition to analyzing the environmental effects of a proposed project, also consider and analyze project alternatives that would reduce adverse environmental impacts." (*Bay-Delta, supra,* 43 Cal.4th at p. 1163.) The Guidelines mandate that the EIR "describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives." (Guidelines, § 15126.6, subd. (a).)

"In determining the nature and scope of alternatives to be examined in an EIR, the Legislature has decreed that local agencies shall be guided by the doctrine of 'feasibility.' " (*Goleta, supra,* 52 Cal.3d at p. 565.) " 'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into

11

account economic, environmental, social, and technological factors." (Pub. Resources Code, § 21061.1.) "Among the factors that may be taken into account when addressing the feasibility of alternatives are site suitability, economic viability, availability of infrastructure, general plan consistency, other plans or regulatory limitations, jurisdictional boundaries (projects with a regionally significant impact should consider the regional context), and whether the proponent can reasonably acquire, control or otherwise have access to the alternative site (or the site is already owned by the proponent). No one of these factors establishes a fixed limit on the scope of reasonable alternatives." (Guidelines, § 15126.6, subd. (f)(1).)

"There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason." (Guidelines, § 15126.6, subd. (a).) Pursuant to the rule of reason, the EIR must "set forth only those alternatives necessary to permit a reasoned choice. The alternatives shall be limited to ones that would avoid or substantially lessen any of the significant effects of the project. Of those alternatives, the EIR need examine in detail only the ones that the lead agency determines could feasibly attain most of the basic objectives of the project." (Guidelines, § 15126.6, subd. (f).) " 'The discussion of alternatives need not be exhaustive . . . .' [Citation.] CEQA 'does not demand what is not realistically possible, given the limitation of time, energy and funds, "Crystal ball" inquiry is not required.' " (*Saltonstall v. City of Sacramento* (2015) 234 Cal.App.4th 549, 583.)

"The process of selecting the alternatives to be included in the EIR begins with the establishment of project objectives by the lead agency. 'A clearly written statement of objectives will help the lead agency develop a reasonable range of alternatives to evaluate in the EIR and will aid the decision makers in preparing findings . . . . The statement of objectives should include the underlying purpose of the project.' " (*Bay-Delta, supra,* 43 Cal.4th at p. 1163.)

12

Here, Riverside's Project goals were to provide an additional point of delivery for bulk power to Riverside's electrical system in order to reliably meet the system's present load and future growth, to upgrade the subtransmission electrical system, to minimize environmental impacts, and to build this new transmission system in a cost-effective manner. The Draft EIR sets forth a detailed explanation about the infeasibility of undergrounding and of constructing within the Eastern Route in the context of these objectives.

a.     <u>Undergrounding the Transmission Lines</u>

Jurupa Valley contends that Riverside failed to "realistically and fairly entertain the possibility of undergrounding a portion of the transmission lines." Jurupa Valley asserts that this failure is evidenced by Riverside's initial determination that undergrounding was not feasible for any of the Project and Riverside's subsequent conclusion that it was feasible to underground a half-mile portion of transmission line adjacent to the airport in order to prevent dangerous obstructions within the flight patterns of local air traffic. Jurupa Valley argues that Riverside's decision to underground a short segment of the 69 kV line to ensure aircraft safety demonstrated that undergrounding was a viable option for the Project. We disagree as substantial evidence supported Riverside's determination that undergrounding was infeasible for the Project, with the minor exception of the half-mile of subtransmission line adjacent to the airport.

The EIR explicated that despite the aesthetic benefit associated with not having the overhead transmission lines running through the community, undergrounding would nonetheless cause visual degradation of the landscape due to the necessary removal of vegetation for transmission line installation and maintenance, and for the creation of transition sites where lines would move from below to above ground. In addition, underground transmission line construction would create greater emissions, increase traffic, and disturb more habitats through the arduous and time-consuming process of trenching the transmission lines. Undergrounding also would increase the likelihood of damaging existing utility lines while trenching.

13

In addition to these concerns, constructing underground transmission lines is substantially more expensive than overhead transmission line construction. Undergrounding shorter lengths of transmission line can cost between 10 to 20 times more than construction for overhead lines due to expenses associated with trenching and the installation of more numerous transition structures. Even when undergrounding longer lengths of transmission line, the cost of undergrounding "would still be expected to be many times more costly than overhead" because the transmission line route is not linear as it was designed to avoid environmental impacts and land use incompatibilities. Due to the many angles in the route, the transmission line would require specially designed structures to maintain its tension if undergrounded.

Moreover, maintaining underground lines would be more arduous due to the vulnerabilities associated with their subterranean location and the limited physical accessibility of the lines. While typically unaffected by weather conditions, the underground transmission lines "are vulnerable to cable/splice failure, washouts, seismic events, and incidental excavation." In comparison to the several hours it typically takes to locate and repair overhead line outages, electrical outages for underground lines "generally last days or weeks while the problem is located, excavated, and repaired." These longer outages "can have an effect on human health and safety, as well as lost production or spoiled food items. For example, the ability to refrigerate food and to maintain medical equipment, homes, commercial businesses, and industrial customers requires reliable power." The Draft EIR explained how these undergrounding concerns applied to both the 230 kV and 69 kV lines.

Based on the foregoing, substantial evidence supports Riverside's conclusion that undergrounding was infeasible for the Project as it failed to meet Riverside's Project objective of building a reliable, cost effective second transmission system with as few environmental impacts as possible. Riverside only opted to permit a half-mile of undergrounding adjacent to the airport to eliminate a significant, life-threatening hazard to air traffic entering and exiting the airport. The record indicates that Riverside solely made this exception out of an absolute necessity to protect the public. This minor

14

exception does not support Jurupa Valley's assertion that Riverside did not fairly and in good faith consider undergrounding for the remainder of the Project.

"CEQA's only purpose is to guarantee that the public and the agencies of the government will be *informed* of environmental impacts, that they will *consider* those impacts before acting, and that insofar as practically possible, *feasible* alternatives and mitigation measures will be adopted to lessen or avoid adverse environmental impacts." (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 695.) The record shows that Riverside's consideration and rejection of undergrounding met these objectives. The EIR makes it evident that the sole benefit to be obtained from undergrounding was aesthetic and that undergrounding increased environmental impacts and was considerably more costly. Substantial evidence thus supports Riverside's rejection of undergrounding as an infeasible alternative for the rest of the Project.

b.      The Eastern Route

In addition, Jurupa Valley argues that Riverside improperly rejected the Eastern Route as an infeasible Project alternative. Riverside initially considered the Santa Ana River East Corridor as a potential route for the 230 kV transmission line and analyzed this alternative route in the June 2006 Siting Study for the Project. That review ascertained that construction of the Eastern Route would exacerbate public safety risks and unnecessarily jeopardize natural resources. Riverside described these issues in a four-page text summary and a chart in the Draft EIR. Riverside also provided additional details in the Final EIR in Master Response #10 Alternatives to Comment, and in additional responses from staff during the administrative process. We discuss Riverside's findings in detail below and conclude that substantial evidence supported Riverside's conclusion that the Eastern Route was not feasible because it failed to satisfy the Project objectives and posed a public safety risk.

15

i.     *Structural and Safety Concerns*

As explained by the Draft EIR, the Eastern Route was infeasible because it required transmission line structures to be placed inside an existing flood control right-of-way, near existing levees. Riverside determined that if placed in this location, the transmission line structures created potential "unavoidable constructability issues" and "operational impacts to . . . levee structural integrity." Since much of the land adjacent to the Santa Ana River corridor had already been developed, a large number of the Eastern Route 230 kV line structures would have to be installed along the edge of the river corridor, directly within the river's 100-year flood zone. Approximately 40 structures would be located in the 100-year flood zone, and an additional seven others in the 500-year flood zone. Large floods would render the transmission lines inaccessible and possibly wash out or cause the collapse of live transmission lines into water. The Eastern Route would jeopardize the reliability of the transmission line and possibly create serious safety hazards.

The Siting Study determined that an alternate route along the eastern river corridor was not available, as the agencies that control the higher ground along the river indicated that they would not permit installation of the transmission infrastructure on their land. Riverside would be required to install other structures, like damns, levees, or other berms, in order to install the transmission lines along the river corridor. This would result in extensive and detrimental environmental impacts and alterations to the existing flood plain. The geotechnical study performed by Edison further indicated that installing this infrastructure to support the transmission lines within the river corridor would expose more transmission towers to higher risks of liquefaction, flooding, erosion, and slope instability than the other alternatives analyzed in the EIR. From a structural perspective, the Eastern Route was simply infeasible and impractical, and pursuing it would be contrary to the Project objectives.

Jurupa Valley argues that these same challenges described with regard to the Eastern Route are also present with the proposed Project route as it crosses the Santa Ana River. As explained above, the Eastern Route involved structures running along and periodically crossing the river due to residential development in the area. In contrast, the proposed route would only cross the river once at a 90-degree angle with a single span of conductor. In making that crossing, the proposed route places only five structures in the 100-year flood plain, in comparison to the Eastern Route's 40 structures within the flood plain. We conclude that Jurupa Valley's argument regarding the comparability of safety and structural risks between the proposed route and the Eastern Route lacks factual support. As explained above, the structural instability and related public safety concerns alone render the Eastern Route infeasible.

ii.  *Environmental Impacts*

Substantial evidence also supports Riverside's conclusion that the Eastern Route was infeasible due to the great environmental impacts that it would create. The Eastern Route would cause greater impacts to biological resources, including sensitive species, habitats, and wetlands than would be caused by the proposed route. The Eastern Route corridor contains habitats that support 14 special status wildlife species and 16 sensitive plant species, several of which would not be impacted in the proposed route. The corridor would sustain losses to plant and animal life as a result of transmission line construction activities.[2] The Eastern Route would also impact sensitive habitat resources, including areas specially earmarked for habitat conservation and identified wetlands. The Eastern Route would thus create greater biological environmental impacts than the proposed route.

---

[2]  To the extent that Jurupa Valley argues that Riverside admits biological studies were not conducted, the record indicates otherwise. Riverside's biologist performed several surveys in the Eastern Route corridor for several special status species, including the Burrowing Owl, Least Bell's vireo, Southwestern Willow Flycatcher, Western Yellow-Billed Cuckoo, and Delhi Sands Flower-Loving Fly.

17

In addition, the transmission lines within the Eastern Route would extend past the Western Riverside County Multiple Species Habitation Conservation Plan territory and enter other counties. The transmission line's route through the adjacent counties would require additional biological studies and consultation with the United States Fish and Wildlife Service in order to proceed with construction, resulting in substantial delays to the Project. Based on these concerns, the Eastern Route also failed to satisfy the Project's timing objectives.

Riverside also determined that the Eastern Route would create aircraft hazards, impact existing land uses, and diminish cultural resources. The Eastern Route 230 kV transmission lines would be located less than half a mile from the Flabob Airport, where the transmission lines would pose a danger to low-flying aircraft. The Eastern Route transmission lines would traverse as many as six city or county parks and other park district land, resulting in greater impacts to lands dedicated for recreation purposes than the impacts within proposed route. The Eastern Route would also visually impact and possibly diminish the cultural value of several California Historic Landmarks, two properties listed on the National Register of Historic Places, and four historically distinct neighborhoods (two with historically important architecture) by introducing highly visible, modern structures into the area.

Aesthetically, the Eastern Route would generate greater impacts than the proposed route. The proposed route contains one perpendicular crossing of the Santa Ana River. In contrast, the Eastern Route would parallel the river for several miles along an established hiking trail, and likely cross the river multiple times due to existing residential development along the corridor. The installation of overhead transmission lines into this area would impair the river views from the nature trail and the surrounding neighborhoods.

The Eastern Route thus failed to satisfy the Project's objective of minimizing environmental impacts. As explained above, Riverside need only discuss alternatives that would avoid or substantially lessen any of the significant effects of the Project. Substantial evidence indicates that the Eastern Route could not satisfy this threshold

18

requirement for inclusion in the EIR as an alternative. Further discussion of the Eastern Route alternative was not necessary for Riverside to engage in a reasoned, informed analysis of the Project.

Jurupa Valley likens Riverside's rejection of the Eastern Route to the lead agency's superficial rejection of alternative locations in *Laurel Heights I, supra,* 47 Cal.3d at page 404, asserting that Riverside's investigation of the Eastern Route was insufficient because it was done during Riverside's internal planning process. In *Laurel Heights I*, the lead agency analyzed the environmental impacts associated with the relocation of a university biomedical research facilities to a newly acquired building in a residential area. (*Id.* at pp. 388-389.) The Supreme Court concluded that the agency's "treatment of alternatives was cursory at best." (*Id.* at p. 403.) Within a scant one and one-half pages of the 250-page EIR, the agency "stated the obvious conclusion that the 'no project' alternative, i.e., no relocation to Laurel Heights, would not have the environmental effects identified in the EIR. It then stated in a mere two-sentence paragraph that ' . . . no alternative sites on . . . campus were evaluated as possible candidates for the location of the basic science units of the School of Pharmacy.' " (*Ibid.*) The EIR similarly concluded that there were no sites off-campus that could accommodate the facility. (*Ibid.*) The Supreme Court stated that this was "merely an admission that such alternatives were not considered," and opined that "[i]t defies common sense for the Regents to characterize this as a *discussion* of any kind; it is barely an *identification* of alternatives, if even that." (*Ibid.*)

*Laurel Heights I* is incongruent to the facts before us. Contrary to Jurupa Valley's contentions, Riverside engaged in meaningful analysis of the alternatives and comprehensively informed the public of its findings within the Draft EIR. Riverside performed its duties as lead agency in scoping the Project and its alternatives prior to the creation of the Draft EIR. (*Goleta, supra,* 52 Cal.3d at p. 569 ["The local agency . . . must make an initial determination as to which alternatives are feasible and merit in-depth consideration, and which do not. [Citation.] In California, this screening process is known as 'scoping.' (See Guidelines, § 15083, subd. (a) ['Scoping has been

19

helpful to agencies in identifying the range of actions, alternatives, mitigation measures, and significant effects to be analyzed in depth in an EIR and in eliminating from detailed study issues found not to be important.'].)"].) Riverside properly described why it rejected these two alternatives in the Draft EIR and provided the public with the multiple studies on which it based its decision. (*Goleta,* at p. 569 [" 'But where potential alternatives are not discussed in detail in the [EIR] because they are not feasible, the evidence of infeasibility need not be found within the [EIR] itself. Rather a court may look at the administrative record as a whole to see whether an alternative deserved greater attention in the [EIR].' "].)

Notably, "CEQA requires neither that the EIR be perfect, nor that the analysis be exhaustive. . . . [C]ourts do not ' "pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document." [Citation.]' [Citation.]" (*City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 922.) We conclude that this EIR was sufficiently informative regarding the rejection and investigation of the Project alternatives. We hold that substantial evidence supported Riverside's elimination of undergrounding and the Eastern Route as viable alternatives.

**3. Substantial Evidence Supports the Court's Determination that Riverside Did Not Pre-Commit to the Project**

Jurupa Valley argues that Riverside impermissibly pre-committed to the Project as evidenced by statements made by RPU, Riverside's commitment of funds to the Project, Riverside's pre-selection of a preferred route, CAISO's approval of the Project, Riverside's Interconnection Facilities Agreement with Edison, and Riverside's decision to underground a portion of the 69 kV subtransmission line despite findings that undergrounding was infeasible.

a. Routine Project Planning Does Not Constitute Pre-Commitment

Jurupa Valley asserts that RPU's statements about the Project, Riverside's budgeting for the Project, and Riverside's Project definition demonstrate that Riverside pre-committed to the Project. The statements and conduct at issue are routinely made and performed during the planning process and do not establish pre-commitment.

To show pre-commitment, Jurupa Valley must prove that Riverside approved the Project before engaging in environmental review. (*Cedar Fair, L.P. v. City of Santa Clara* (2011) 194 Cal.App.4th 1150, 1160-1161 (*Cedar Fair*); Pub. Resources Code, §§ 21061, 21151; Guidelines, § 15004(a).) Approval in this context "means the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person. . . . Legislative action in regard to a project often constitutes approval." (Guidelines, § 15352, subd. (a).) Public agencies are barred from "tak[ing] any action which gives impetus to a planned or foreseeable project in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project." (Guidelines, § 15004, subd. (b)(2)(B).) In determining whether the agency has impermissibly pre-committed to the project, "the critical question is 'whether, as a practical matter, the agency has committed itself to the project as a whole or to any particular features, so as to effectively preclude any alternatives or mitigation measures that CEQA would otherwise require to be considered, including the alternative of not going forward with the project. (See [Guidelines], § 15126.6, subd. (e).)' " (*Cedar Fair at p.* 1170, citing *Save Tara, supra,* 45 Cal.4th at p. 139.)

i. *RPU's Statements About the Project*

First, Jurupa Valley asserts that in 2006, Riverside and RPU made statements showing pre-commitment to the Project. One set of statements was made by RPU in a RPU Board Memorandum, dated January 20, 2006. There, RPU stated that "[a]pproval is required for . . . procuring the necessary services to continue development of the 220 kV Upgrade Project." RPU also stated: "It is planned that the authorization to construct will be granted by the City Council, acting as the Lead Agency in the [CEQA] process." The

21

other statement Jurupa Valley relies on to prove pre-commitment is within another RPU Board Memorandum dated February 17, 2006, where RPU stated: "As was outlined in the January 20 presentation to the Board, this project must move forward in order to meet customer energy needs."

These statements made by RPU did nothing more than express that the Project required approval by City Council in the future. RPU's memorandums did not legally bind Riverside to any particular course of action, particularly because RPU lacked the authority to commit Riverside to the Project, which required City Council approval. Moreover, these statements cannot reasonably be construed as legally binding Riverside to move forward with the Project absent environmental review.

ii. *Riverside's Budgeting of the Project*

Second, Jurupa Valley asserts that Riverside's Capital Improvement Plan (CIP) demonstrated that "significant funds already were committed to the Project in advance of any objective environmental review." We disagree because the CIP was a planning document intended to project the City's capital needs through fiscal year 2015/2016. The CIP's statements regarding projections of funds for various projects is not an approval of any project: the CIP expressly states that its adoption "does not signal appropriation of funds." In a letter from the to the Mayor and City Council accompanying the transmittal of the CIP, the City Manager confirmed that "the CIP [was] a planning document and does not directly appropriate funds."

Jurupa Valley mischaracterizes the CIP in stating that Riverside has committed over $92 million to the Project. First, based on the plain reading of the document, the 2009/2010 through 2013/2014 projection of $16.0 million of City Funds for the Project was not an allocation; it was a projection for planning purposes. The document does not indicate that such funds were ever allocated to the Project. Second, the 2007/2008 capital plan's appropriation of $90.2 million was allocated not just to the Project, but also to another electricity project called the Sub-Transmission Project. It is unclear how much of the $90.2 million was allocated to the Project. Nonetheless, it appears that the CIP halted making projected allocations for the Project when the Project became delayed in the

22

permitting and licensing phase. Such conduct indicates that Riverside is not pre-committed and is not indifferent to the necessity for review and permitting of the Project.

Furthermore, such fiscal planning and budgeting of projections do not constitute pre-commitment as they do not require Riverside to build the Project. "[W]hen an agency proposes to adopt 'a mechanism for funding proposed projects that may be modified or not implemented depending upon a number of factors, including CEQA environmental review,' no commitment to the projects has been made" (*City of Santee v. County of San Diego* (2010) 186 Cal.App.4th 55, 59.) Rather such activities are consistent with CEQA's directive that the planning and environmental review occur concurrently to the fullest extent possible. (Guidelines, § 15004, subd. (c).) We thus conclude that Riverside's budgeting and financial planning activities in this context do not evidence pre-commitment.

### iii. *Project Definition*

Third, Riverside's Project definition also failed to show pre-commitment. Jurupa Valley argues that by "selecting a preferred option to build a new high-voltage power line at the outset, Riverside placed significant bureaucratic weight behind this decision and thereby demonstrated its pre-commitment to the Project." Jurupa Valley asserts that "the Project could have been adequately defined and evaluated as a project to increase the electrical capacity in Riverside."

It is well established that "[o]nly through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal (i.e., the 'no project' alternative), and weigh other alternatives in the balance." (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 192-193 (*County of Inyo*).) To achieve this, the EIR must "adequately apprise all interested parties of the true scope of the project for intelligent weighing of the environmental consequences." (*City of Santee v. County of San Diego* (1989) 214 Cal.App.3d 1438, 1454–1455.) "An accurate, stable and finite project description is the *sine qua non* of an informative and

23

legally sufficient EIR." (*County of Inyo,* at p. 193; Guidelines, § 15004, subd. (b) [the EIR should provide "meaningful information for environmental assessment"].)

Riverside's decision to define the Project as a new high-voltage power line delineated the scope of the Project and allowed the public and Riverside to engage in meaningful analysis and consideration of its environmental impacts. All parties involved were able to identify the location of the Project, the extent of the Project, and the environmental impacts of it. The identification of this high-voltage power line as the Project was indispensible to successful environmental review. Jurupa Valley's proposed project definition is too broad and indefinite to afford the public and Riverside adequate environmental review. Had the Project been defined as "a project to increase the electrical capacity in Riverside," it would be entirely unclear what was to be constructed, where it was to be placed, how the environment would be impacted, and who would be affected by it. Such a definition is too unstable and evasive of environmental review. (See *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 656 ["when an EIR contains unstable or shifting descriptions of the project, meaningful public participation is stultified. 'A curtailed, enigmatic or unstable project description draws a red herring across the path of public input.' "].)

Simply defining the Project based on studies conducted in the planning process leading up to the creation of an EIR does not constitute pre-commitment. As the lead agency, Riverside was tasked with defining the Project so that appropriate environmental review could ensue. Riverside successfully accomplished this task. We therefore conclude Riverside's identification of the high-voltage power line did not constitute pre-commitment.

In sum, these routine project planning activities, which involve discussing the Project with the RPU Board, budgeting for the Project, and defining the Project, separately and together do not evidence pre-commitment as they are necessary and routine to achieving CEQA compliance.

24

b. Obtaining Approval from CAISO and FERC Did Not Constitute Pre-Commitment

Jurupa Valley argues that Riverside's interaction with CAISO and Federal Energy Regulatory Commission (FERC) during project planning establish Riverside's pre-commitment. As a practical matter, CAISO and FERC approval were essential for planning the Project as described below.

i. *CAISO's Approval*

Jurupa Valley argues that CAISO's direction to Edison in June 2006 to build a new connection between Edison's grid and the City of Riverside constitutes pre-commitment by Riverside. Jurupa Valley misconstrues CAISO's relationship with the parties and the significance of CAISO's directions to Edison in making this argument. As mentioned in our description of the facts of this case, CAISO is the independent electrical grid operator for approximately 80% of California's power grid. Here, Edison owns the portion of the power grid at issue (and would own part of the project's facilities) and CAISO operates Edison's facilities. Edison worked in conjunction with Riverside and RPU to develop and scope the Project to create new facilities to service Riverside. Nonetheless, Edison must work with CAISO as CAISO would operate the Edison facilities and as the Project would alter CAISO's operations.

Jurupa Valley essentially argues that the relationship between Edison and CAISO and CAISO's approval of Edison's plans to extend the grid result in Riverside's pre-commitment. Jurupa Valley relies on a quote from a memorandum regarding the Project's history, which states: "At a June 2006 [CAISO] Board of Governors meeting, the CAISO concluded that the proposed interconnection was needed and directed [Edison] to build the proposed [Riverside Transmission Reliability Project] as soon as possible and preferably no later than June 30, 2009." At that meeting, the CAISO Board specifically gave its approval as to one of three options considered by Edison and Riverside for the Project. Jurupa Valley argues that "by seeking and obtaining CAISO's approval so early on, SCE and Riverside were pigeonholed into constructing the proposed . . . Project" in accordance with the option approved of by CAISO, i.e. "looping

25

the existing Mira Loma-Vista #1 230 kV line by building 8.25 miles of new 230 kV double circuit transmission line from the existing Mira Loma-Vista #1 T/L ROW to a new 230 kV [Edison] interconnection facility with RPU's new Jurupa Substation in Riverside."

We conclude that Edison's consultation with CAISO does not commit Riverside to the Project prior to environmental review. Obtaining CAISO's approval to operate this proposed addition to the grid is an issue for Edison, which would own part of the new facilities, to address, and would affect how Edison would operate the Project facilities if they were ever to be constructed. As pointed out by the superior court, CAISO has no authority to mandate action by Riverside: Edison owns CAISO-controlled facilities, not RPU or Riverside. Edison cannot unilaterally commit Riverside, the lead agency, to the Project simply by discussing and obtaining approval from CAISO regarding its preference.

ii.    <em>FERC Approval and the Interconnection Facilities Agreement</em>

Jurupa Valley asserts that Riverside pre-committed to the Project by entering into the Interconnection Facilities Agreement with Edison. Jurupa Valley argues: "In the Interconnection Facilities Agreement, [executed in 2009,] Riverside and SCE agreed upon specific terms and obligations, including, *inter alia*, engineering, design, and construction duties; maintenance obligations; operating duties and procedures; modifications to facilities; the allocation of costs; metering parameters; and billing and payment procedures between Riverside and SCE. . . . The Interconnection Facilities Agreement between Riverside and SCE sets out extensive details that go far beyond the basic or general terms for planning purposes; instead, the Interconnection Facilities Agreement further demonstrates Riverside's pre-commitment to the Project."

Jurupa Valley mischaracterizes the Interconnection Facilities Agreement and fails to recognize its purpose in the planning process. Riverside and Edison executed the Agreement and submitted it to FERC for approval, describing the services to be provided by Edison pursuant to the Transmission Operator Tariff (the rate to be charged for electricity). The FERC is "the federal agency charged with regulating transmission and

26

sale of electric energy for resale in interstate commerce." (*In re Electric Refund Cases* (2010) 184 Cal.App.4th 1490, 1493.) "The Federal Power Act governs the transmission and wholesale sales of electrical energy in interstate commerce. [Citation.] Pursuant to its authority under the FPA, FERC has exclusive jurisdiction over interstate wholesale power rates. [Citations.] The FPA requires that all rates for the transmission and sale of wholesale electricity be filed with FERC and published for public review. [Citation.] FERC is obligated to ensure that wholesale power rates are 'just and reasonable,'[citation], and applied in a non-discriminatory manner, [citations]." (*California ex rel. Lockyer v. FERC* (9th Cir. 2004) 383 F.3d 1006, 1011.) Here, FERC's approval was an essential threshold issue for the Project and was decisive as to Edison's ability to provide Riverside with power.

In order to obtain FERC approval, the Interconnection Facilities Agreement set forth the parties' basic obligations to each other in the event the Project was built. However, the Agreement does not require the Project to be built in a certain way or at all. The Agreement clearly acknowledges the necessity for CEQA compliance and analysis. The Agreement provides that "environmental impact studies" will be completed for the Project; that "Riverside will act as a lead [CEQA] agency;" and that Riverside will "perform the necessary environmental review as required by CEQA." The Agreement references the requirement to complete CEQA review multiple times, and anticipates that Riverside's reimbursement for expenditures associated with the Project is conditioned on CEQA review. Most importantly, the Agreement does not obligate Riverside to approve the Project and does not foreclose any alternatives or mitigation measures.

In *Cedar Fair,* the appellate court considered whether adoption of a term sheet constituted an approval of a project. The term sheet in *Cedar Fair* was a 39-page document that included extensive details concerning a proposal to develop a football stadium complex for the San Francisco 49ers in Santa Clara. (*Cedar Fair, supra,* 194 Cal.App.4th 1150, 1167 at p. 1169.) The appellate court concluded the city's approval of the term sheet did not trigger CEQA, despite the large amount of money already invested by the redevelopment agency and the term sheet's high level of detail.

27

(*Id*. at pp. 1167-1173.) As the court explained, "although the term sheet is extremely detailed, it expressly binds the parties to only continue negotiating in good faith." (*Id*. at p. 1171.) The term sheet "merely 'memorialize[d] the preliminary terms' and only mandate[d] that the parties use the term sheet as the 'general framework' for 'good faith negotiations.' " (*Id*. at p. 1170.) Under the term sheet, the city and redevelopment agency expressly retained its sole discretion under CEQA, including deciding not to proceed with the project. (*Ibid*.)

Likewise here, although the Interconnection Facilities Agreement contains great detail regarding the parties' obligations to each other, these obligations are perspective and dependent on Riverside's independent CEQA review. Riverside was not obligated to approve the Project or forego Project alternatives and mitigation measures pursuant to the Agreement. We thus conclude that the Agreement did not commit Riverside to the Project.

c.       Modifications to the Project in Response to Public Comment Show that Riverside Did Not Pre-Commit

Lastly, Jurupa Valley argues that "Riverside pre-committed to the Project as evidenced by its willingness to contradict its own findings and the evidence in the administrative record in order to push the Project forward" when it decided to underground the half-mile of 69 kV subtransmission line adjacent to the airport. As explained in preceding sections, Riverside chose to underground a very small portion of sub-transmission line out of necessity to ensure the safe passage of air traffic in the area adjacent to the airport. Riverside found that undergrounding this small section of subtransmission line would not cause an increased or new, significant environmental impact based on the Draft EIR's previous anticipation of minor undergrounding in its analysis of the construction impacts, Riverside's choice of undergrounding materials, and the location of the proposed undergrounding. We conclude that the decision to underground a small portion of subtransmission line does not evidence Riverside's willingness to "push forward with the project." Riverside clearly considered the serious implications of undergrounding and of the public safety hazard posed by overhead

28

subtransmission lines next to the airport.  Riverside found that as to this particular stretch of transmission line, undergrounding was appropriate as it caused no new or increased environmental impacts and eliminated a serious safety hazard from the Project.

Contrary to Jurupa Valley's assertions, Riverside's willingness to make modifications to the Project in response to public comment indicates that Riverside thoughtfully engaged and responded to public comment and made informed decisions, consistent with CEQA's objectives.  (See *San Franciscans Upholding the Downtown Plan v. City and County of San Francisco, supra,* 102 Cal.App.4th at p. 695 [stating that CEQA's purpose is to guarantee that the public and the decision makers are fully informed of the environmental impacts, and that feasible alternatives and mitigation measures are adopted to lessen or avoid adverse impacts].)  We conclude that the allegedly impermissible acts argued by Jurupa Valley failed to individually or collectively establish pre-commitment.

## DISPOSITION

The judgment is affirmed.  Defendants and Respondents City of Riverside and the Riverside Public Utilities Department, and Real Party in Interest and Respondent Southern California Edison are awarded their costs on appeal.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



JONES, J. [*]

We concur:


EDMON, P. J.


ALDRICH, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.